**Charlotte MOORE, Appellant–Respondent,**

v.

**JASPER COUNTY DEPARTMENT OF CHILD SERVICES, Appellee–Petitioner.**

No. 37A03–0803–JV–103.

Court of Appeals of Indiana.

Sept. 29, 2008.

Mark L. Callaway, Rensselaer, IN, Attorney for Appellant.

Barry A. Chambers, Indiana Department of Child Services, Indianapolis, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Charlotte Moore ("Mother") appeals the involuntary termination of her parental rights to her children, C.R.M. and C.B.M. Mother challenges the sufficiency of the evidence supporting the trial court's judgment.

We reverse.

### FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of C.R.M. and his twin sister, C.B.M. (collec-

tively, "the twins"), born June 17, 2004.[1] On January 1, 2006, the Jasper County Department of Child Services ("JCDCS") was contacted by law enforcement officers who had been called to Mother's residence due to an altercation between Mother and two of her older children, D.M. and J.M. All three tested positive for alcohol. Mother was arrested for battery, and D.M. was arrested and placed in the Porter County Detention Center due to an outstanding warrant. Mother's remaining children were allowed to remain in the home under the supervision of their grandmother because no foster homes were available.[2]

This was not the JCDCS's first contact with Mother. Since 1996, the JCDCS had received approximately thirteen referrals for neglect, abuse, or lack of supervision involving Mother and her children; however, not all of the referrals were substantiated. During this time, JCDCS had provided various services in an attempt to help Mother improve her parenting skills, including intensive home-based counseling services. Counseling and parenting advice had also been provided to M.M., the twins' teenaged sister, who served as the twins' primary caregiver prior to their removal from the family home in January 2006.

On January 17, 2006, the twins and M.M. were removed from the family home, and a detention hearing was held the same day. Following the detention hearing, the trial court determined there was probable cause to believe M.M. and the twins were children in need of services ("CHINS").[3] The children were made temporary wards of the State and were placed in therapeutic foster care. Following the children's initial removal, it was discovered that the twins were behind on their immunizations and were significantly developmentally delayed. Additionally, C.B.M. was diagnosed with Congenital Sucrose–Isomaltase Deficiency ("CSID"), a condition in which the body does not produce the enzyme needed to break down natural sugars. C.R.M. and C.B.M. were formally removed from Mother, pursuant to a dispositional decree, on March 6, 2006.[4]

The JCDCS filed separate petitions to involuntarily terminate Mother's parental rights to C.R.M. and C.B.M. on July 18, 2007. A fact-finding hearing on the termination petitions was eventually held on December 19, 2007. Uncontroverted evidence reveals that, at the time of the termination hearing, Mother was married, had enrolled at Ivy Tech Community College to pursue a Licensed Practical Nurse ("L.P.N.") degree after having already completed several prerequisite classes, had regained custody of two of her minor chil-

---

1. Mother has five additional biological children, including: A.M., born August 18, 1986; D.M., born April 25, 1988; M.M., born March 10, 1990; N.M., born February 13, 1992; and, J.M., born March 12, 1993. Paternity of the twins was never established, and the parental rights of the twins' unknown father were terminated on January 23, 2008. The unknown father does not participate in this appeal.

2. N.M. and J.M. were subsequently placed in the care of their biological father.

3. At the time of the termination hearing, M.M. remained in foster care. Consequently, we

limit our recitation of the facts to those pertinent to the termination of Mother's parental rights to the twins.

4. Unfortunately, several important documents were not included in the record on appeal, including copies of the trial court's detention, dispositional, and CHINS orders, as well as the CHINS petition, thereby frustrating our review. Counsel is reminded that Indiana Appellate Rule 50(A)(1) states that the purpose of an Appendix in civil appeals is to present this Court with copies of those parts of the record on appeal that are necessary to decide the issues presented.

dren, had obtained her driver's license, had recently re-initiated individual counseling, and had obtained suitable housing.

At the termination hearing, JCDCS caseworker Monica Oliver ("Oliver") acknowledged that Mother had completed several court-ordered services. Oliver testified that Mother had: (1) submitted to a psychological assessment; (2) undergone a substance abuse assessment; (3) successfully completed parenting classes; (4) participated in consistent visitation with the twins; (5) obtained suitable housing; and (6) paid $1,010.20 in child support, but was $175.00 in arrears. Oliver remained concerned, however, with Mother's problem with "consistency," specifically referencing Mother's inconsistency in maintaining employment, participating in individual counseling, and maintaining contact with the JCDCS throughout the CHINS proceedings. Tr. at 24–28. In recommending termination of Mother's parental rights to the twins, Oliver acknowledged Mother's recent improvements, but stated she had "no evidence" as to Mother's "long-term ability to parent the children[,]" to "provide them with consistent care and guidance, and [to] provide for their needs[.]" *Id.* at 28. Jennifer Hatfield, foster care case manager with The Villages, also testified that she had concerns as to whether Mother would properly supervise and medicate the twins should they be returned to her care.

The twins' Guardian Ad Litem ("GAL"), Richard Comingore ("Comingore"), was strongly opposed to the termination of Mother's parental rights. In so testifying, Comingore stated:

> I believe it would be detrimental to terminate the parental rights for these two children with the mother at this point in time. This has been a challenging case for me to deal with as a guardian ad litem. One, it was fairly short notice in which I was appointed; and certainly

[Mother] . . . has a colorful history, as I think testimony would illustrate today, perhaps. But I have also had the opportunity to visit the house where they're currently living. . . . And I believe the marriage has provided an opportunity of stability to [Mother] that she's never been afforded previously.

\* \* \*

> The house is a four-bedroom house. . . . Very clean. There was food there. There was heat there. . . . [N.M.] and [J.M.] were there, as well as [Husband's] two other children . . . for visitation, because he is a divorced father. And that was a very opportune moment for me to observe the reaction of the kids together, because of the two families. I thought it was very appropriate, very positive.

*Id.* at 65–66. Comingore went on to testify that he felt Mother's case was "a unique case because [he] saw what appeared to be a changed person in . . . [Mother.]" *Id.* at 66. When asked to describe what he meant, Comingore stated:

> I saw a person who was very calm, was very concerned about her children, the [twins], as well as the third one that was also in foster care, the older child. I saw a person who was making valiant attempts to change her lifestyle through parenting classes, through attending Ivy Tech to become a L.P.N., licensed practical nurse. I saw a person living in a home which was clean and very appropriate.

*Id.* at 66–67.

In addition to his testimony concerning Mother, Comingore also testified as to his opinion of Husband. Comingore indicated that he was initially concerned about Hus-

band's history[5] and how his presence in the home would affect the family, so Comingore contacted the Deputy Prosecuting Attorney. According to Comingore, the Deputy Prosecuting Attorney "allayed those concerns." *Id.* at 68. Comingore and Husband both testified that Husband was employed and had an annual income of approximately fifty thousand dollars, as well as a 401K plan and health insurance through his employer. Comingore concluded that what he saw was, "a woman who had seven children and was trying to raise them to the best of her ability as a single mother, and was fighting an absolutely up-hill battle" until the marriage between Husband and Mother which provided her "a very positive environment for her and her family." *Id.* at 68–69.

Finally, Mother's sister, an L.P.N., and her own mother both testified that they were willing to help Mother care for the twins when they were not in school should Mother regain custody. Additionally, Mother's sister testified she would help Mother get C.B.M. to all of her medical appointments at Riley Hospital for Children because she, too, had a child with special medical needs that required traveling to the hospital for doctors' visits.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On January 23, 2008, the trial court issued separate orders terminating Mother's parental rights to C.R.M. and C.B.M. The trial court's orders were identical with the exception of the captioning and names. Mother filed separate appeals of the trial court's termination orders. This appeal ensued. On June 20, 2008, this Court ordered the separate appeals consolidated under a single cause number.

## DISCUSSION AND DECISION

Mother alleges the trial court's orders terminating her parental rights to C.R.M. and C.B.M. are not supported by sufficient evidence. Specifically, Mother asserts the JCDCS failed to prove by clear and convincing evidence (1) that there is a reasonable probability the conditions leading to the twins' removal and continued placement outside the home would not be remedied or that continuation of the parent-child relationship poses a threat to the twins' well-being and (2) that termination of Mother's parental rights is in C.R.M.'s and C.B.M.'s best interests.

Initially, we note our standard of review. This Court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.,* 750 N.E.2d 832, 836 (Ind.Ct.App. 2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 264 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. *Id.*

Here, the trial court made specific findings in terminating Mother's parental rights. Where the trial court enters specific findings of fact, we apply a two-tiered standard of review. First, we must determine whether the evidence supports the findings. *Bester v. Lake County Office of Family & Children,* 839 N.E.2d 143, 147 (Ind.2005). Second, we determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208

---

**5.** At the time of the termination hearing Husband was on work release while serving a one-year sentence stemming from a conviction for driving while an habitual offender.

(Ind.Ct.App.1999), *trans. denied.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Bester,* 839 N.E.2d at 147.

## I. Deficient Termination Orders

■ Before addressing Mother's allegation that the trial court's termination orders are not supported by clear and convincing evidence, we are obliged to point out that the trial court's termination orders are deficient in that they failed to satisfy the requirements of Indiana Code Sections 31–35–2–4(b) and –8. Indiana Code Section 31–35–2–4(b)(2) sets forth the specific requirements that must be alleged and proved by clear and convincing evidence in order to involuntarily terminate a parent-child relationship. *See* slip. op. at 10. Indiana Code Section 31–35–2–8 provides in relevant part that "if the court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship."

Our review of the termination orders reveals that the trial court neglected to make any findings specifically pertaining to the statutory requirements delineated in Indiana Code Section 31–35–2–4(b)(2)(B) and (C). Instead, the trial court's findings appear to be a mere recitation of the evidence presented during the termination hearing. *See* slip op. at 12–14. Our Supreme Court has explained, "A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact." *In re T.J.F.,* 798 N.E.2d 867, 873 (Ind.Ct.App.2003). In addition, the trial court did not make any conclusions based on its findings and failed to provide an explanation as to how its findings support its judgments. Consequently, we are unable to determine whether the trial court violated Mother's parental rights in terminating her parental relationship with the twins. *See In re J.Q.,* 836 N.E.2d 961, 966 (Ind.Ct.App. 2005) (concluding that the limited findings of the juvenile court made it difficult to determine whether or not a mistake had been made in adjudicating J.Q. a CHINS); *see also In re T.J.F.,* 798 N.E.2d at 874 (quoting *Perez v. U.S. Steel Corp.,* 426 N.E.2d 29, 33 (Ind.1981)) (concluding that findings which are merely a recitation of evidence presented at the hearing are "not findings of basic fact in the spirit of the requirement").

■ The termination of one's parental rights is of such importance that we must be convinced the trial court has based its judgment on proper considerations. *Parks v. Delaware County Dep't of Child Servs.,* 862 N.E.2d 1275, 1280–81 (Ind.Ct. App.2007). We cannot make such a determination based on the trial court's findings in the present case. Although we recognize that the trial court is not required to make findings in termination cases unless specifically asked to do so by the parties, once the trial court decides to do so, it is bound under Indiana Trial Rule 52(A) to make findings that support the judgment. *Id.* at 1280; *see also In re Estate of Inlow,* 735 N.E.2d 240, 250 (Ind.Ct.App.2000) (stating that special findings must contain the ultimate facts from which a trial court has determined the legal rights of the parties). Moreover, we are bound by the findings of the trial court on the issues covered and are not at liberty to look to other evidence to support its judgment. *See generally Parks,* 862 N.E.2d at 1280.

Because the trial court's findings appear to be a mere recitation of the evidence presented during the termination hearing, and because the trial court failed to provide a nexus between its purported findings and its judgments, we conclude that

the trial court's orders terminating Mother's parental rights to C.R.M and C.B.M. do not satisfy the requirements of Indiana Code Sections 31–35–2–4 and –8. In light of our review of the evidence contained in the record, however, simply remanding this cause with instructions for the trial court to enter specific factual findings that are fully supported by the evidence and to provide an explanation as to how its factual findings support its termination orders would not cure the error in this particular case.

## II. Clear and Convincing Evidence

■ Mother asserts on appeal that the JCDCS failed to prove by clear and convincing evidence there is a reasonable probability that the conditions leading to the twins' removal from her care will not be remedied, that continuation of the parent-child relationship poses a threat to the twins' well-being, and that termination of her parental rights is in the twins' best interests, as is required for the termination of parental rights. *See* Ind.Code § 31–35–2–4(b)(2)(B) and (C). Although Mother acknowledges that she has a "history of significant problems," Mother argues on appeal that she has taken "significant steps" to correct past problems "thus creating a more stable lifestyle." Br. of Appellant at 12. Mother further points out that the GAL was "unwavering in his opposition to termination at this time" and that his recommendations, as an "independent witness and advocate for the children" should be "balanced with the recommendations of the caseworker." *Id.* at 15.

■ The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester,* 839 N.E.2d at 147. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of our fundamental liberty interests. *Id.* However, these parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re M.B.,* 666 N.E.2d 73, 76 (Ind.Ct.App.1996), *trans. denied.* Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *In re K.S.,* 750 N.E.2d at 836.

■ In order to terminate a parent-child relationship, the State is required to allege:

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2) (1998).[6] If the trial court finds the allegations in the termination petition described in section four to be true, the court shall terminate the parent-child relationship. Ind.Code § 31–35–2–8 (1998). The State must establish each of these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind.1992).

■ The clear and convincing evidence standard requires a stricter degree

6. Additional conditions not at issue in this case are also required to be alleged and proved before the termination of parental rights may occur pursuant to Indiana Code Section 31–35–2–4(b)(2)(A).

of proof than a mere preponderance of the evidence. *K.J.P. v. State*, 724 N.E.2d 612, 615 (Ind.Ct.App.2000), *trans. denied.* In ordinary civil actions, a fact in issue is usually sufficiently proved by a preponderance of the evidence. *Id.* However, "clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals." *Id.* (quoting *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 360–61 (Ind.1982)). Such is the case with termination of parental rights proceedings. When reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing, but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing the evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. *In re B.H.*, 770 N.E.2d 283, 288 (Ind.2002).

■■■■■ When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will or will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind.Ct.App. 2001), *trans. denied.* The court must also, however, "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence

of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion County Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind.Ct.App. 2002), *trans. denied.* Moreover, the JCDCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind.Ct.App.2007).

The trial court made the following pertinent findings in determining there is a reasonable probability the conditions leading to the twins' removal from Mother's care will not be remedied:

> The Court further finds that the incident which led to the removal of [the twins] took place on January 1, 2006, when [Mother] returned home and began fighting with her son, [D.M.], and both [Mother] and her son, [D.M.], were intoxicated. This led to [Mother] being arrested, and the children, [M.M.], [C.B.M.] and [C.R.M.], being taken into custody. Both [N.M.] and [J.M.] then went to live with their father.

> The Court further finds that over the years, there have been repeated attempts to help [Mother] improve her parenting skills, with little success.

> The Court further finds that during the first two years of [C.B.M.] and [C.R.M.]'s lives, [M.M.] and [Mother's] mother were the primary caregivers for [the twins], as [Mother] had a habit of being gone for extended periods of time.

> \* \* \*

> The Court further finds that at the time [the twins] were made wards of the [JCDCS], both children were experiencing developmental delays. Following their placement, both [C.B.M.] and

[C.R.M.] were evaluated and qualified for speech and occupational therapy services.

\* \* \*

Further, both of said children had medical issues, in that neither child was current in their immunizations. Further, [C.R.M.] is receiving treatment for his asthma and allergies, and is required to perform breathing exercises, which he dislikes.

[C.B.M.] was treated at Riley Children's Hospital in Indianapolis, Indiana, and it was determined that she had a congenital sucrase-isomaltase deficiency and, without a strict diet and use of sucraid medication before and after meals, [C.B.M.] is prone to diarrhea and stomach cramps.

\* \* \*

The Court further finds that when said children were first placed out of the home, they would run wildly through the home of their foster parents, would attempt to get into anything that was lying around, and would scream or cry to communicate, all of which has improved due to consistency and a structured environment.

With regard to [Mother], it would appear that she has made some improvements in her life. She is now enrolled in counseling, is enrolled in school, has a driver's license and, while not employed, her husband has a good job and is capable of supporting the family and paying for [Mother's] education so that she can obtain better employment. [Mother] also claims not to have used alcohol for a substantial period of time.

The Court further finds that most of these improvements have taken place since the Petition for Termination of Parental rights was filed on July 18, 2007.

The Court would note that [Mother] was introduced to her husband, Mr. Bradbury, by one of her sons who was serving a sentence at Jasper County Community Corrections, where [Husband] is also incarcerated until April of this year.

[Mother] and her husband are now residing in a four-bedroom home in the country on four acres; however, [Husband] only receives two passes a month for twelve hours for each pass.

The Court further finds that [Husband] was previously married and has three sons from that marriage; however, they do not reside with him.

Further, following their marriage, [Mother] obtained custody of her children, [N.M.] and [J.M.], after the boys' father refused to have custody of the children any longer.

The Court further finds that since the filing of the petition to terminate the parent-child relationship, [Mother] has obtained a husband, a home, and regained custody of two of her children. However, we do not know how [Mother] will function with a full-time husband and four children in the home, particularly when two of the children have special needs and medical needs.

The Court further finds that before the mandate from the federal government for a speedy permanent resolution for children, the Court would have been willing to delay this termination proceeding to see whether or not the changes which [Mother] has made in her life are permanent, and whether she can properly care for [the twins].

However, [the twins] have been in foster care for almost half of their lives, and the court can no longer delay its decision to see if [Mother's] improve-

ments are permanent and if she and her new husband will be able to provide a stable home for [the twins] after [Husband] is released from Community Corrections on or about April 15, 2008.

The Court further finds that the improvements made by [Mother] are too little and too late, and therefore the Petition for the Involuntary Termination of Parent–Child Relationship between [the twins] ... and Charlotte [M.], the mother ... should be granted.

Appellant's App. pp. 35–38. Mindful of our deferential standard of review, a thorough review of the record nevertheless leaves us convinced that the JCDCS failed to prove by clear and convincing evidence there is a reasonable probability the conditions leading to the twins' removal will not be remedied or that continuation of the parent-child relationship poses a threat to the twins' well-being.

We first observe that the majority of the trial court's findings set forth above indicate its decision to terminate Mother's parental rights was improperly based on her parental inadequacies as they existed at the time of the twins' removal, as opposed to Mother's abilities and circumstances as they existed at the time of the termination hearing, as is required by the termination statutes. Second, our review of the record reveals that by all accounts, including the trial court's own termination order, Mother had made significant strides in accomplishing the majority of the dispositional goals put in place by the JCDCS. For example, the trial court's termination order acknowledges, and the evidence indicates, that by the time of the termination hearing, Mother was married, was enrolled in school to become a licensed practical nurse, had obtained her driver's license, had regained custody of two of her older children, had re-enrolled in counseling, and was living in a four-bedroom home that was reported to be "clean and very appro-

priate." Tr. at 67. Additionally, the record reveals that Husband was gainfully employed as a welder making approximately fifty thousand dollars ($50,000.00) annually, that he was willing to continue to financially support Mother and her children while Mother attended school, and that the twins would be eligible for health coverage through his employer should Mother regain custody. Finally, the GAL strongly objected to the termination of Mother's parental rights. Although acknowledging Mother's "colorful history," Comingore testified that this was a "unique case," that he believed Mother was a "changed person," that Mother's marriage had provided her with "an opportunity of stability ... that [Mother had] never been afforded previously[,]" and that termination of Mother's parental rights would be "detrimental" to the twins' well-being. *Id.* at 65–66.

Based on the foregoing, we conclude that the trial court's termination order was not supported by clear and convincing evidence. As explained previously, a trial court must judge a parent's fitness to care for his or her children *at the time of the termination proceeding, taking into consideration evidence of changed conditions. Bester,* 839 N.E.2d 143, 152 (Ind.2005). The trial court's statement that it "would have been willing to delay this termination proceeding to see whether or not the changes which [Mother] has made in her life are permanent, and whether she can properly care for [the twins]" if not for the federal government's mandate requiring a speedy and permanent resolution for children, suggests the trial court's decision to terminate Mother's parental rights to the twins may have been improperly based, at least in part, on a suspicion that Mother's change in circumstances may not be permanent. *See In re R.J.,* 829 N.E.2d 1032, 1039 (Ind.Ct.App.2005) (concluding that parental rights "cannot and should not be terminated on the *potential* for harm or

because some hypothetical circumstance may come true" and further stating that "[t]hese types of speculative situations exist in many different environments, but are not bases for the termination of parental rights."); *see also In re D.D.*, 804 N.E.2d at 268 (stating that termination of parental rights cannot be based entirely upon conditions which existed in the past, but which no longer exist), *trans. denied.*

Admittedly, in the context of termination cases, extended litigation imposes a substantial burden "on the most vulnerable people whom the system and such cases seeks to protect: the children." *Baker v. Marion County Office of Family & Children*, 810 N.E.2d 1035, 1040 (Ind.2004). Nevertheless, our Supreme Court has held fast to its pronouncement that "American public policy holds that children are likely raised best by their parents. Parental termination is a last resort." *Id.* at 1041. We realize that the twins' emotional and physical well-being hangs in the balance. Nevertheless, we must apply the law as it exists, and in this case, the JCDCS has failed to carry its burden of establishing, by clear and convincing evidence, that there is a reasonable probability the conditions leading to the twins' removal from Mother's care will not be remedied and that continuation of the parent-child relationship poses a threat to the twins' well-being.[7]

### Conclusion

In failing to provide a nexus between its purported findings, which simply recite the evidence presented during the termination hearing, and its decision to terminate Mother's parental rights to the twins, the trial court's termination orders fail to satisfy the requirements of Indiana's termination statutes. Additionally, although cognizant of the high degree of deference to be given a trial court's decision to terminate a parent-child relationship, we nevertheless can affirm a trial court's judgment only if we find that a reasonable trier of fact could have concluded the judgment was established by clear and convincing evidence. Without weighing the evidence or assessing witness credibility, a thorough review of the record leaves us with a firm conviction that the trial court's termination orders are not supported by clear and convincing evidence. Accordingly, the trial court's orders terminating Mother's parental rights to C.R.M. and C.B.M. are clearly erroneous.

Reversed.

ROBB, J., and MAY, J., concur.

---

**7.** Having determined the JCDCS failed to prove by clear and convincing evidence either that there is a reasonable probability the conditions leading to the twins' removal will not be remedied or that continuation of Mother's parent-child relationship poses a threat to the twins' well-being, we need not address Mother's additional contention that the JCDCS failed to prove that termination of her parental rights is in the twins' best interests. *See Egly*, 592 N.E.2d at 1234 (stating that the Department of Child Services must prove each element of in Indiana Code Section 31–35–2–4(b) by clear and convincing evidence in order to terminate a parent-child relationship).