## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 09 2018, 6:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan B. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of U.R. (Minor Child);

T.R. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

April 9, 2018

Court of Appeals Case No.
18A02-1709-JT-2203

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

The Honorable Amanda L. Yonally, Magistrate

Trial Court Cause No.
18C02-1606-JT-23

**Najam, Judge.**

# Statement of the Case

T.R. ("Mother") appeals the trial court's termination of her parental rights over her minor child U.R. ("Child"). Mother raises one issue for our review, which we restate as the following two issues:

> 1. Whether the trial court violated Mother's constitutional rights when it did not immediately cease an initial hearing when Mother stated that she wanted to hire an attorney.

> 2. Whether the trial court's conclusion that the reasons that resulted in Child's removal from Mother's care will not be remedied is clearly erroneous.

We affirm.

# Facts and Procedural History

In March of 2015, Mother admitted Child was a CHINS based on Mother's use of "illicit substances, including methamphetamines, opiates, and marijuana." Ex. Vol. I at 17. As a result, the trial court entered a dispositional decree in which it ordered Mother to refrain from the use of any illegal substances, to participate in home-based counseling, to complete a substance-abuse assessment, and to submit to random drug screens. On June 23, 2016, the Indiana Department of Child Services ("DCS") filed a petition to terminate Mother's parental rights over Child based on her failure to comply with the dispositional order. Along with its petition to terminate her rights, DCS informed Mother that she was "entitled to representation by counsel, provided

by the state if necessary, throughout any proceedings to terminate the parent/child relationship . . . ." Appellant's App. Vol. 2 at 17.

[4] Nearly two months later, the court held an initial hearing on the termination petition, and Mother appeared at that hearing *pro se*. At the beginning of the hearing, she engaged the court in a colloquy in which she stated that she had some college education, no mental or emotional disabilities, and that she was not under the influence of any substances. She then asked the court if she "was allowed to ask to have my visits reinstated," and the court told her that they would "get to that." Tr. Vol. 2 at 6.

[5] The court then reviewed DCS's petition and informed Mother that she had the right to an attorney during the termination proceedings. Mother then informed the court that she wanted "to try to get an attorney," and the court acknowledged her statement. *Id.* at 9. Mother declined the opportunity to have the court appoint her a public defender. The court then informed Mother that it would give her "until the next hearing to . . . engage private counsel," and Mother said, "Okay." *Id.* at 11. The court further advised Mother of her right to remain silent.

[6] The court then scheduled the next hearing date. However, before adjourning, the court asked the Family Case Manager ("FCM") for an update on Child's placement and visitation. After that update, the court returned to Mother's initial comment that she wanted to "ask to have [her] visits reinstated," *id.* at 6,

and the court asked Mother what she wanted to say, *id.* at 15. Rather than exercise her right to remain silent, Mother stated as follows:

> [MOTHER]: Well . . . , you know last time I was here, you know I was obviously a hot mess. . . . I chose to go to the Hope House. When I got there I was coming off of heroin and meth and I did not get along and I felt like that was a bad thing. The only reason I missed that appointment . . . is because I was at the Hope House . . . [and] I had to go complete community service . . . . But I've been—I've did everything. I threw myself into NA. I've been in NA every day, I've had a sponsor. You know everybody wanted me to go and get on . . . Suboxone to come off the heroin. I did not want to do that because I felt like that was just another chemical . . . . [But] yet I did do that. . . . I believe it's . . . helped me a lot. . . . It has kept me going and I just, really want to see my son. I'm trying so hard, so hard. I'm doing everything, you know, . . . except for the . . . three of them . . . two of those I was at the Hope House to miss those screens and them appointments with her. That's the only reason I missed it and the only reason I missed the one on one is because I had prior things to do for the community service.

> * * *

> But since then . . . I have worked on me. I've worked on our relationship with me and my baby's father, we're getting along. We're coming to agreements. . . . I believe I'm in a way better place than I was the last time you seen me. And I . . . believe I am more stable without the Seroquel because it . . . makes me fluctuate, it makes me go from one to another as well. So, I believe that I don't need that medication. I have not had . . . it for two months, not one time since I've stopped using the other chemicals have I had a moment where I've snapped out on DCS . . . . I haven't showed any signs that Seroquel—me not

taking the Seroquel is a[n] issue. I don't feel any type of suicidal thoughts . . . I believe I have a clear head today.

THE COURT: What's the situation with the continuing positive screens for marijuana?

[MOTHER]: That was just for me to help me with the withdraw[al]s from the heroin and stuff, because I don't want to take the Suboxone or methadone.

THE COURT: Okay that sounds to me like it's . . . an excuse to continue to use drugs.

[MOTHER]: No. No, it was just to help me not to go back to use the heroin . . . .

THE COURT: . . . I understand . . . how difficult it is to get clean from heroin. I do understand that. And I commend you on your progress because things were not good last time I saw you. . . . [B]ut I remain seriously concerned about your decision to use one illicit drug to replace another illicit drug.

*Id.* at 15-18. The court then informed Mother that if she could have at least "six consecutive clean screens . . . and full engagement in services and compliance . . . with the recommendations" between the initial hearing and the next hearing, the court would reinstate supervised visitations. *Id.* at 20.

[7] On November 29, 2016, Mother was admitted to the emergency room of the Indiana University Health Ball Memorial Hospital in Muncie. At that visit, Mother admitted to "[c]urrent" use of heroin, marijuana, methamphetamine,

and "[p]rescription medications." Ex. Vol. 2 at 231-32.[1] On December 12, Mother was again admitted to the emergency room at that hospital, and she again admitted to current use of those substances. *Id.* at 240. Lab results conducted during that visit likewise demonstrated that Mother had used amphetamine/methamphetamine and opiates, and the treating physician diagnosed her with "polysubstance abuse." *Id.* at 233. In January of 2017, Mother refused to submit to any more drug screens.

[8] In March and May, the trial court held its final, fact-finding hearings on DCS's termination petition. After that hearing, the court entered the following findings of fact:

> 22. At the fact-finding hearing on February 23, 2015[,] on the petition alleging [C]hild to be a child in need of services, [M]other admitted to using illicit substances, including methamphetamines, opiates, and marijuana.
>
> * * *
>
> 35. Dr. Kenneth McCoy is a licensed psychologist and Clinical Director at Anchor Behavioral Counseling.
>
> 36. Dr. McCoy conducted a complete psychological evaluation for [Mother] in November of 2015.

---

[1] Our pagination of Exhibit Volume 2 is based on the .pdf pagination.

37. The purpose of this evaluation was to determine the fitness of [M]other having [C]hild returned to her custody.

38. Diagnoses made from this evaluation included opiate dependence, amphetamine dependence, non-specified personality disorder, and a rule out of bi-polar disorder

* * *

41. Mother has an extensive history of substance abuse; by the age of fifteen, she was using illicit intravenous drugs including methamphetamine.

42. Mother was actively using illicit substances at the time of the psychological evaluation.

43. Dr. McCoy recommended that [M]other consult with a psychiatrist and submit to an in-patient drug treatment program.

* * *

45. On or about May 4, 2016[,] the father left [C]hild with [M]other, who was under the influence of an illicit substance.

* * *

47. FCM [Dominique] Geers arrived at the home and knocked, but no one answered the door.

* * *

50.  Officer Kyle Temple of the Muncie Police Department was dispatched to the parents' residence.

* * *

52.  [C]hild and [M]other were located in the home.

53.  FCM Geers removed [C]hild from [M]other.

54.  Officer Temple left the residence[] but was called back . . . approximately forty-five minutes later based on a call for a battery, domestic . . . disturbance.

* * *

56.  Officer Temple met with father, who reported that [M]other had struck him, that [M]other was in the house[,] and that she was intending to burn the house down.

57.  Officer Temple smelled kerosene as he approached the house.

58.  [M]other was in the house pacing back and forth, and her pants were wet from the knees down.

59.  [M]other told the officer to tell her son that she loved him.

60.  Officer Temple was unable to access the home because the doors were locked.

61.  [M]other had a lighter and was attempting to light it.

62. Officer Temple called for the fire department to stage outside of the house.

63. Officer Temple repeatedly attempted to convince [M]other to come outside of the home.

64. Twice [M]other dumped a can of gasoline on her head.

65. [M]other got gasoline in her mouth and eyes and exited the residence.

66. The officer transported [M]other to the hospital.

* * *

69. Kourtney Gallegos ("Therapist") is a therapist who specializes in addictions treatment.

70. The therapist has worked with [M]other since the summer of 2015.

71. Mother's attendance at therapy has been consistent.

* * *

74. Mother sometimes submitted to drug screens requested by the therapist and sometimes declined to submit to drug screens requested by the therapist.

* * *

76. During the pendency of the CHINS case, [M]other . . . had periods of sobriety, the longest of which lasted approximately five (5) months.

77. Mother was not in a period of sobriety as of the second day of the fact-finding hearing [in May of 2017].

78. The span of time between relapses with illicit substances increased for [M]other during her therapy.

79. Mother's use of marijuana is routine for her, and [M]other has not identified abstinence from marijuana as a treatment goal.

* * *

83. As of the second day of the fact-finding [hearing], [M]other continued to need weekly, regular treatment for her substance addictions.

* * *

85. Mother has been under a court order to submit to drug screens since November of 2015.

* * *

90. Mother's compliance with drug screens was very good between June of 2015 and January of 2017.

91. Mother had short periods of time when she was negative for all substances.

92.  Mother was consistently positive for marijuana.

93.  There were multiple segments of time during the CHINS case when [M]other was consistently positive for methamphetamine.

94.  Mother was positive for methamphetamine and opiates on . . . December 12, 2016.

* * *

97.  Mother last submitted to a drug screen on January 4, 2017.

98.  After January 4, 2017, FCM Geers had conversations with [M]other regarding drug screens and services.

99.  In January or February of 2017, FCM Geers sent a certified letter to [M]other to remind [M]other of services available to her and of the expectation that [M]other continue to submit to drug screens.

100.  FCM Geers sent text messages to [M]other approximately every other week to remind [M]other of services available to her and of the expectation that [M]other continue to submit to drug screens.

101.  FCM Geers attempted to have conversations with [M]other about services and drug screens after each court hearing.

102.  Mother directly refused at least three (3) drug screen requests made by FCM Geers . . . in 2017.

103. Mother understood that she was under a court order to submit to drug screens and that there was a drug screen schedule to which she had agreed to adhere.

104. Mother refused to comply with the court order for drug screens and with the schedule for drug screens since January 4, 2017.

Appellant's App. Vol. 2 at 95-100. The court then concluded, among other things, that there was a reasonable probability that the conditions that resulted in Child's removal from Mother's care will not be remedied, and the court ordered the termination of Mother's parental rights over Child. This appeal ensued.

## Discussion and Decision

### *Overview*

[9] We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely

because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[10] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[11] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of*

*Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[12]     Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[13]     Here, Mother raises two issues for our review. First, Mother asserts that the trial court denied her right to counsel at the August 2016 initial hearing on DCS's petition to terminate her parental rights. Second, Mother argues that DCS failed to meet its burden to show that the conditions that resulted in

Child's removal from her care will not be remedied.[2]  We address each argument in turn.

### *Issue One:  Mother's Right to Counsel*

[14]  We first address Mother's argument the trial court denied her her constitutional rights when it continued to hold the initial hearing "without counsel for Mother where Mother was asked questions by the Trial Court."  Appellant's Br. at 10.  According to Mother, the trial court violated her rights "under the First Amendment," "under the Fourteenth Amendment Due Process and Equal Protection Clauses," and under "the Ninth Amendment to the US Constitution."  *Id.*

[15]  Mother's argument is not supported by cogent reasoning.  She cites no authority for a right to counsel under the First, Ninth, or Fourteenth Amendments.  She does not discuss the Sixth Amendment.  And while she cites Indiana Code Section 31-32-2-5, which does provide for the right to counsel in termination proceedings, she does not apply it on the facts of this case.

[16]  More critically, Mother does not acknowledge that she was informed of her right to counsel when DCS filed its petition nearly two months prior to the initial hearing.  Mother also does not acknowledge that she was advised of her right to remain silent at the initial hearing, a right she chose not to exercise after

---

[2]  As we affirm the trial court's judgment on this issue, we need not consider Mother's alterative arguments under Indiana Code Section 31-35-2-4(b)(2)(B).

having been so advised. And Mother does not acknowledge that the trial court's colloquy with her was in direct response to Mother's affirmative representation to the court that she wanted to "ask to have my visits reinstated." Tr. Vol. 2 at 6. In other words, Mother was properly advised of her rights; she does not argue that she was improperly advised of her rights; and, after having been properly advised, she chose not to immediately exercise those rights because she wanted to argue for the reinstatement of her visitation. We reject Mother's argument on appeal that the trial court violated her right to counsel at the initial hearing.

### Issue Two: Whether the Conditions that Resulted in Child's Removal will be Remedied

[17] We thus turn to Mother's argument that the trial court clearly erred when it concluded that the conditions that resulted in the removal of Child from Mother's care will not be remedied. In determining whether the evidence supports the trial court's conclusion that Mother was unlikely to remedy the reasons for Child's removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of

conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[18] The trial court did not clearly err when it concluded that the conditions that resulted in the removal of Child from Mother will not be remedied. One of the conditions that led to Child's removal from Mother was Mother's drug use. As DCS succinctly states, "Mother's drug use was not remedied at the time of trial." Appellee's Br. at 28. Indeed, just between the initial hearing in August of 2016 and the fact-finding hearing in May of 2017, Mother twice appeared at an emergency room and admitted to using numerous illicit substances. At the second emergency room visit, her statement was confirmed by lab tests. Just a few weeks after that visit, Mother began refusing to submit to any drug screens. And the trial court found that "Mother was not in a period of sobriety as of the second day of the fact-finding hearing [in May of 2017]." Appellant's App. Vol. 2 at 98. We also note that DCS presented evidence that Mother continued to lack stable housing and employment as of the final termination hearing.

[19] Mother's argument on appeal amounts to a request for this court to reweigh the evidence that was before the trial court, which we cannot do. The trial court's

findings are supported by the evidence, and its findings support its conclusions. We affirm the trial court's termination of Mother's parental rights over Child.

[20] Affirmed.

Robb, J., and Altice, J., concur.