## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 06 2018, 8:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: A.J. and N.J. (Minor Children): <br><br> L.H. (Mother), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | June 6, 2018 <br><br> Court of Appeals Case No. 18A-JT-130 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Faith A. Graham, Judge <br><br> The Honorable Tricia L. Thompson, Juvenile Magistrate <br><br> Trial Court Cause Nos. 79D03-1707-JT-67 79D03-1707-JT-68 |

**Najam, Judge.**

# Statement of the Case

L.H. ("Mother") appeals the trial court's termination of her parental rights over her minor children N.J. and A.J. ("the Children"). Mother presents a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of her parental rights. We affirm.

# Facts and Procedural History

Mother and M.J. ("Father") were unwed teenagers when N.J. was born in 2011 and when A.J. was born in 2013. On March 29, 2015, someone contacted the Indiana Department of Child Services ("DCS") to report that Father had physically abused a girlfriend's (not Mother's) eighteen-month-old child while he was under the influence of synthetic marijuana and alcohol. Father had left the scene with the Children, but they were later found. Father was arrested and the Children were transported to a local hospital for well-child checks. Mother's whereabouts at that time were unknown. Accordingly, DCS took the Children into custody. Thereafter, DCS filed petitions alleging that the Children were children in need of services ("CHINS"). After Mother and Father failed to fully comply with services, on July 26, 2017, DCS filed petitions to terminate their parental rights over the Children.

Following a hearing, the trial court granted the petitions on July 27, 2017. In support of its order, the trial court entered the following findings and conclusions:

   FINDINGS OF FACT

1. [L.H.] (DOB 2/13/1997) is the Mother and [M.J.] (DOB 6/11/1995) is the Father of [N.J.] (DOB 7/24/2011) and [A.J. (DOB 10/22/2013).

2. Tippecanoe County Department of Child Services ("DCS") received a report on March 29, 2015[,] alleging that Father physically abused a minor child and had left the scene with his two minor children. Father was believed to be under the influence of synthetic marijuana and alcohol.

3. Investigation revealed that the eighteen (18) month old child of Father's girlfriend was taken to the emergency room due to multiple contusions all over his head and swelling in several areas. The child's injuries were not consistent with Father's explanation and Father was arrested for Battery on a Child. Father was on probation at the time for Battery with a Deadly Weapon. [N.J. and A.J.] were taken to the hospital for a well child check. They had dirt caked on their feet and hands and had moderate diaper rash. The children were bathed at the hospital due to their condition. [N.J.] became fearful and yelled "dildo" when her diaper was changed. A drug screen on [A.J.] returned positive for marijuana. Mother was not able to be located and was believed to be homeless at the time. Once Mother was located, Mother tested positive for marijuana. The children were taken into custody on March 29, 2015.

4. DCS filed Children in Need of Services ("CHINS") petitions and a Detention Hearing and Initial Hearing were held on March 30, 2015. At that time, Father remained in custody of the Tippecanoe County Sheriff's Department and Mother had not been located. A CASA was appointed to represent the best interests of the children. The children were adjudicated CHINS and dispositional orders were issued on June 12, 2015. The children have remained out of the home continuously since that date.

5. Pursuant to dispositional orders, Mother was offered the following services: case management, mental health assessment, domestic violence assessment, drug screens, and parenting time. Additional services were later offered including psychological evaluation, individual therapy, medication evaluation, parenting education, and transportation assistance. Pursuant to dispositional orders, Father was offered the following services: case management, mental health assessment, domestic violence assessment, and parenting time once the no contact order was lifted. Father has remained incarcerated for the entire CHINS case and his incarceration has limited his ability to participate in services. These services were exhaustive and were designed to address the parents' difficulties.

6. Case conferences, family team meetings, and review hearings were held periodically. DCS and CASA prepared separate written reports and recommendations prior to each hearing.

7. A permanency hearing was held on August 31, 2016[,] at which time the permanent plan was determined to be initiation of proceedings for termination of parental rights. DCS filed petitions to terminate. However, the Court denied the petitions to terminate on January 6, 2017[,] and efforts at reunification were continued. Another permanency hearing was held on May 22, 2017[,] at which time the permanent plan was determined to be initiation of proceedings for termination of parental rights. Mother failed to appear at said hearing. DCS filed its petitions in the above-referenced Cause Nos. on July 26, 2017. The evidentiary hearing on the Verified Petitions to Terminate Parental Rights was held on September 6, 2017. Father appeared by telephone due to his incarceration and Mother failed to appear for the hearing.

8. Mother is very young, lacks a support system, and has a history of instability with housing and employment. Mother was eighteen (18) years old when the CHINS case was initiated. Mother became pregnant with [N.J.] when she was thirteen (13)

years old and then became pregnant with [A.J.] when she was fifteen (15) years old. Mother did not graduate from high school.

9. Mother was provided case management services to assist with obtaining stable housing, employment, and connecting to other resources. Despite some periods of compliance and participation, Mother failed to make significant progress toward any of the goals of case management. After the first termination proceeding, Mother was discharged from multiple providers for missed sessions.

10. Mother has been employed primarily at fast food restaurants and at factories through staffing agencies. Mother's longest employment was at McDonalds for eight (8) months. During the CHINS case, Mother was employed at Park 100 Foods from March to April of 2016. Mother worked at Dairy Queen but left in January of 2017 after maternity leave. Mother started a new job at the end of April of 2017, but quit after only two (2) weeks. Mother reported new employment at a nursing home in May of 2017 but no verification was ever provided.

11. Mother primarily lived with Maternal Grandmother throughout most of the CHINS case. Maternal Grandmother has a history of inappropriate boyfriends and drug abuse, specifically crack cocaine. Maternal Grandmother's home is not appropriate for reunification with the children and Mother failed to maintain independent housing. Although Mother briefly obtained her own apartment in subsidized housing, she was evicted in May of 2017. Mother is no longer eligible for subsidized housing and is again living with Maternal Grandmother.

12. Mother completed a clinical assessment in July of 2015 with a diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood, ADHD (by history) and Cannabis Abuse. Mother completed a psychological evaluation in May of 2016 and was diagnosed with ADHD, Generalized Anxiety Disorder

(in remission) and marijuana use disorder (in sustained remission). It was recommended that Mother participate in individual therapy and a medication evaluation.

13. Mother participated in approximately four (4) therapy sessions from February of 2016 until August of 2016 at Howard Regional Health. Mother then began participating in therapy at KidPsych, Inc. in September of 2016. Mother was attending therapy well and making progress as of November 7, 2016. Mother informed DCS in February of 2017 and again in May of 2017 that she was no longer participating in therapy. KidPsych is not a contracted DCS provider and DCS has received no reports from the therapist to indicate that Mother has returned to therapy.

14. At the beginning of the CHINS case, Mother tested positive for marijuana. Mother began using marijuana at the age of sixteen (16) and used daily until March of 2015. Mother tested positive for marijuana again on August 16, 2017 and August 29, 2017. Mother also tested positive for alcohol on March 21, 2016[,] then again on February 17, 2017, February 21, 2017, March 16, 2017, and March 30, 2017. Additionally, Mother failed to submit to multiple screens in 2017.

15. Although there were no safety concerns during visits that Mother attended and Mother interacted with the children appropriately, Mother's attendance at visits was inconsistent. After the first termination proceeding, Mother started visits with Lifeline in January of 2017 and was discharged in February of 2017 having attended only six (6) of the nine (9) scheduled visits. Mother's visits were in home and semi-supervised at that time. Mother resumed visits with Just Do It (JDI) in April of 2017, also semi-supervised in Mother's apartment until Mother was evicted at which time visits became fully supervised in the community. Mother demonstrated a pattern of disappearing a few weeks at a time then contacting the visit provider with a new

telephone number. Mother missed multiple visits during these disappearances. Mother attended only sixteen (16) of the forty-two (42) visits between April 4, 2017[,] and September 6, 2017. When Mother missed visits, the children were upset and cried. At the time of the evidentiary hearing, Mother had not seen the children for almost one (1) month.

16. During the CHINS case, Mother gave birth to two (2) children. Mother was in a relationship with the father of the first subsequent child for approximately one (1) year but did not know how to spell his name. Mother indicated she ended this relationship because he was a marijuana dealer. The father of the second subsequent child is [D.B.] Mother and [D.B.] were both arrested for domestic violence in March of 2016 although the charges against Mother were later dismissed.

17. Howard County DCS received a report regarding Mother's subsequent born children and conducted an assessment in December of 2016. Although [D.B.] tested positive for marijuana, no action was taken at that time. At the time of the evidentiary hearing, Howard County DCS was conducting another assessment for a new report of neglect and substance abuse in Mother's home.

18. Mother has acknowledged childhood exposure to domestic violence including one of Maternal Grandmother's boyfriends who burned down their house. Mother has also acknowledged her own pattern of violent relationships including her relationship with [D.B.] Nevertheless, Mother married [D.B.] on May 3, 2017[,] and was dishonest with DCS about the marriage.

* * *

23. CASA, Charles Stewart, supports termination of parental rights in the best interests of the child. CASA observed that the case has been open for over two (2) years and has regressed since

December of 2016. CASA noted that Mother's participation in services has been limited. Mother was evicted, quit her job, tested positive for marijuana, missed multiple drug screens, missed multiple court dates, married her violent boyfriend, and failed to communicate with DCS, CASA, and service providers. The children have been in foster care over two (2) years with no end in sight. CASA believes the children should not have to wait longer for permanency.

24. On September 6, 2017, the day of the evidentiary hearing on the termination petitions, the children had been removed from the care of the parents for eight hundred ninety-two (892) days, over two (2) years and five (5) months. The children need permanency and neither parent can provide that for the children. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. Mother does not have stable housing or the ability to provide a stable home for the children. Mother continues to choose violent relationships. Father remains incarcerated for physical abuse of a child. To continue the parent[-]child relationships would be detrimental to the children.

CONCLUSIONS OF LAW

1. There is a reasonable probability the conditions that resulted in removal of the children from the home or the reasons for continued placement outside the home will not be remedied. There is no reasonable probability that either parent will be able to provide adequately for the children.

2. Continuation of the parent-child relationships poses a threat to the well-being of the children. The children need stability in life. The Children need parents with whom the children can form permanent and lasting bonds to provide for the children's emotional and psychological as well as physical well-being. The children's well-being would be threatened by keeping the children in parent-child relationships with either parent.

3. DCS has a satisfactory plan of adoption for the care and treatment of the children following termination of parental rights. The children can be adopted and there is reason to believe an appropriate permanent home has or can be found for the children.

4. For the foregoing reasons, it is in the best interests of [the Children] that the parental rights of [Mother] and [Father] be terminated.

Court grants Verified Petition to Terminate Parental Rights of [Mother].

It is ORDERED that the parent-child relationship(s) between [Mother] and [the Children] be, and the same is hereby, involuntarily terminated. All rights, powers, privileges, immunities, duties and obligations (including the right to consent to adoption) pertaining to such relationship(s) are permanently terminated.

Appellant's App. Vol. II at 12-16. This appeal ensued.[1]

# Discussion and Decision

[4] We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to

---

[1] Father does not participate in this appeal.

those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[6] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[7] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

On appeal, Mother contends that the trial court erred when it concluded that: the conditions that resulted in the Children's removal and the reasons for their placement outside of Mother's home will not be remedied; there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children; and termination is in the Children's best interests. Because the statute is written in the disjunctive, we need not address the court's conclusion that continuation of the parent-child relationship poses a threat to the Children's well-being. I.C. § 31-35-2-4(b)(2).

### *Conditions that Resulted in the Children's Removal will not be Remedied*

In determining whether the evidence supports the trial court's finding that Mother is unlikely to remedy the reasons for the Children's removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support,

and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[10] Mother does not challenge the trial court's findings on this issue, and we cannot say that the trial court clearly erred when it concluded from those findings that the conditions that resulted in the Children's removal will not be remedied. The Children were removed from Father and Mother's care due to Father's arrest. At that time, DCS could not locate Mother, who was homeless, lacked stable employment, and abused marijuana. At the time of the termination hearing, Mother lacked stable housing and stable employment, and she continued to abuse marijuana.

[11] In particular, as the trial court found, during the CHINS proceedings, Mother "primarily lived" with her grandmother, who had a "history of inappropriate boyfriends and drug abuse, specifically crack cocaine." Appellant's App. Vol. II at 13. Mother "briefly obtained her own subsidized housing" but she was "evicted in May of 2017" and resumed living with her grandmother. *Id.* As the trial court found, Mother's grandmother's home "is not appropriate for reunification with the [C]hildren." *Id.* Mother has a pattern of quitting jobs after short stints of employment, and she continues to abuse marijuana, having tested positive a few weeks before the termination hearing. Finally, Mother married D.B., who has a history of domestic violence.

Mother's arguments on appeal simply seek to have this court disregard the evidence most favorable to the trial court's judgment and instead reweigh the evidence in her favor, which we cannot do. We cannot say that the trial court clearly erred when it concluded that the conditions that resulted in the Children's removal will not be remedied.

### Best Interests

In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

Again, Mother does not challenge the trial court's findings in support of this conclusion. Still, Mother contends that termination is not in the Children's best interests because she has "made some strides in both her personal stability and her ability to parent her child[ren]" and she "is bonded to her children." Appellant's Br. at 16-17. Mother's contentions on this issue amount to nothing more than a request that we reweigh the evidence, which, again, we cannot do.

[15] DCS presented evidence that in the months leading up to the termination hearing, Mother only attended sixteen out of the scheduled forty-two appointments to visit the Children. Mother had not seen the Children for over one month prior to the final hearing. In addition, Mother was unsuccessfully discharged from home-based services and family services, and she did not consistently participate in recommended individual therapy. The Children need consistent and reliable care, and they need permanency. Tasha Tolson, the DCS family case worker, testified that Mother "has less stability now" than when Mother first started services. Tr. at 31. In addition, the Children's CASA testified that termination of Mother's parental rights is in the Children's best interests because "the case has gone on over two years and seems to be regressing seriously." *Id.* at 39. The totality of the evidence, including Mother's historical inability to provide a safe and stable home and her failure to comply with services, supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

[16] Affirmed.

Robb, J., and Altice, J., concur.