## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 29 2018, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael P. DeArmitt
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of C.H. (Minor Child);

B.H. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 29, 2018

Court of Appeals Case No.
18A-JT-449

Appeal from the Bartholomew Circuit Court

The Honorable Kelly S. Benjamin, Judge

The Honorable Heather M. Mollo, Magistrate

Trial Court Cause No.
03C01-1607-JT-3980

**Najam, Judge.**

## Statement of the Case

B.H. ("Father") appeals the trial court's termination of his parental rights over his minor child, C.H. ("Child"). Father presents a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of his parental rights. We affirm.

## Facts and Procedural History

Child was born to Father and E.A. ("Mother") on March 3, 2011. On April 11, 2015, someone at a Chuck E. Cheese restaurant contacted law enforcement to report that Mother and her then-boyfriend, J.G., were intoxicated and that Child and his half-sibling, C.G., were unsupervised at the restaurant. Officers, in turn, contacted the Indiana Department of Child Services ("DCS"), and Laura Ledgerwood, an assessment worker for DCS, investigated. Mother and J.G. admitted to being addicted to heroin. At that time, Father had not exercised visitation with Child for two or three months. DCS removed Child from Mother's care on April 12[1] and filed a petition alleging that Child was a child in need of services ("CHINS"). On June 9, the trial court found Child to be a CHINS. After Father and Mother failed to fully comply with services, on July 18, 2016, DCS filed a petition to terminate their parental rights over Child.

---

[1] Child stayed overnight with an aunt on April 11 after the incident at Chuck E. Cheese.

Following a hearing on December 9, 2016, and continued to January 27, 2017, the trial court granted the petition on January 22, 2018.[2] In support of its order terminating Father and Mother's parental rights, the trial court entered the following relevant findings and conclusions:

> 5. On or about April 11, 2015, DCS investigated a report that the Child was the victim of neglect. Owners of Chuck E. Cheese had called police with concerns that Mother and her husband [sic] were under the influence of an intoxicant and the Child was unsupervised. (State's Exhibit 7).

> 6. The Child was removed from Mother's care on April 12, 2015 and has remained out of either parent's home since that time.

> 7. A Verified Child in Need of Services ("CHINS") Petition was filed on April 14, 2015. (State's Exhibit 5).

> 8. On June 9, 2015, Mother and Father stipulated that the Child is a Child In Need of Services. (State's Exhibit 9).

> 9. In addition to the events at Chuck E. Cheese as noted in Paragraph 5 above, Mother and Father also stipulated to the following facts: In the course of police and DCS contact, Mother admitted to being a heroin addict and receiving daily methadone treatment. Mother submitted to a drug screen, which was positive for Methamphetamine, Diazepam, and Methadone. Mother and her husband [sic] acknowledged a history of substance use. (State's Exhibit 9).

---

[2] There is no explanation for the one-year delay between the final hearing and the termination order.

10. On June 29, 2015, a Dispositional Hearing was held with Mother. The essential terms required Mother to (1) continue engaging in Methadone Treatment through Indianapolis Treatment Center, (2) complete a substance abuse assessment, and successfully complete any recommended treatment, (3) complete home-based case management services to assist with parenting, community resources, budgeting, and establishing a home, (4) attend scheduled Visitations with the Child, and (5) submit to random drug/alcohol screens within twenty-four hours of said request. (State's Exhibit 12.)

11. On June 29, 2015, a Dispositional Hearing was held with Father. The essential terms required Father to (1) participate in Fatherhood Engagement to aid in the bond between Father and Child, (2) complete a substance abuse assessment, and successfully complete any recommended treatment, (3) complete a domestic Violence assessment, as recommended by the treatment team, (4) participate in scheduled Visitations with the Child, and (5) submit to random drug/alcohol screens within twenty-four hours of said request. (State's Exhibit 12).

12. To aid in the management of the case, Mother and Father were also expected to (1) maintain weekly contact with the Family Case Manager (FCM); (2) timely notify FCM of any changes in circumstances or arrests; (3) sign releases for FCM to monitor compliance; (4) enroll and participate in programs in a timely manner; (4) allow access to the parent's home and access to the child; (5) maintain safe and suitable housing; and (6) maintain a legal source of income. (State's Exhibit 12).

B. FACTS RELATING TO CHILD'S CONTINUED REMOVAL FROM PARENTS' HOME AND CARE: THREAT TO CHILD'S WELLBEING, CHILD'S BEST INTEREST, & DCS PLAN FOR CARE AND TREATMENT

1. After formal removal of the Child on or about April 12, 2015, the Child was never returned to the home or care of either parent.

* * *

3. Father continually questioned why he was asked to participate in services, as he was the "non-offending" parent, and did not believe he needed to participate in services. At the first Child and Family Team meeting after the Child's removal, the FCM explained to Father that even non-offending parents might benefit from services. Father was observed to smack the table and stated, "Only God could judge him." Father left the meeting at that point. Father's mother attended the Child and Family Team Meeting and commented that Father struggled with mental illness as way of explaining his conduct.

4. In May 2015, Father received referrals for a substance abuse evaluation and Fatherhood Engagement services. Father had failed to initiate either referral by the time of a Court Status Hearing on July 27, 2015. It was also reported at the Status Hearing that Father had failed to maintain contact with DCS and had denied entry into his home on June 25, 2015. At the conclusion of the Status Hearing, Father was given a deadline of July 31, 2015 to contact Fatherhood Engagement and Adult and Child for the substance abuse evaluation. (State's Exhibit 14).

* * *

6. On August 26, 2015, Father completed the substance abuse assessment with Adult and Child.

7. Siobhan Nelson of Adult and Child found Father to be irritable and hostile during his substance abuse assessment, and she questioned the veracity of Father's responses. Father displayed anger at having to answer questions and considered the questions beneath him. He repeatedly expressed that the evaluation was a waste of time. Ms. Nelson recommended that Father receive services to address anger management and parenting, as well as complete a psychological evaluation. (State's Exhibit 36).

8. By September 2015, Father made contact with Fatherhood Engagement. For the first few months, it was hard for the case manager to establish goals with Father. They initially chose to focus on Father moving forward on independent living. Father was living with his mother at the time and receiving SSI benefits. Regular contact though was lacking. He attended two out of three appointments in October and kept no appointments in November of 2015. The referral was scheduled to close for lack of participation but the treatment team was in agreement that the service should continue to further the father son relationship. By November 2015, the Child had been placed with paternal grandmother, as more fully discussed below. With Father in the same home, it was agreed that Father's referral would remain open. (State's Exhibits 15 & 16).

9. In December 2015, Father participated in two appointments with Fatherhood Engagement. Some of the work focused on Father's goals of compliance with DCS and all service providers. Father continued to express anger, frustration, and distrust. Attempts were made to redirect Father. (State's Exhibit 28).

10. In January 2016, Father participated with Fatherhood Engagement on January 6, and January 12. Father canceled an appointment for January 14, 2016 and the case manager cancelled the next appointment for January 20, 2016. The caseworker made multiple attempts to schedule an appointment with Father for January 26, 2016, without success. The report for January concluded that Father's progress was minimal due to lack of motivation and follow-through. (State's Exhibit 29).

11. Father also received a referral for anger management in September 2015. At the time of the December 22, 2015 Court Status Hearing, he had yet to initiate contact with the provider. There were continuing signs that anger management would benefit Father. In addition to the hostility displayed early on in the case, as outlined above, the FCM reported at the December Status Hearing that communication with Father was difficult.

She cited a home visit in which Father refused to stay. (State's Exhibit 16).

12. In October 2015, Father received the referral for a psychological evaluation with Dr. Linda McIntire of Shelby Psychological Services. Despite several attempts to make contact with Father, Father failed to schedule an appointment. Father, however, reported to FCM that he had a scheduled appointment in December 2015. Father did not have any scheduled appointments in December 2015 with Shelby Psychological Services.

\* \* \*

14. The Department of Child Services filed a Petition for Parental Participation as to Mother and Father on January 21, 2016. (State's Exhibit 18.)

\* \* \*

16. On February 8, 2016, the Court held a hearing on the Department's Petition for Parental Participation, and ordered Father to make the Child available to service providers to allow sibling Visits, to complete an intake assessment for anger management, complete a psychological evaluation through Dr. Linda McIntire of Shelby Psychological, participate in supervised visitations, and participate in Fatherhood Engagement. Father was given a twenty-four (24) hour deadline to contact Shelby Psychological, the Visitation supervisor, and Fatherhood Engagement. (State's Exhibit 21).

17. Fatherhood Engagement was also willing to take a fresh approach with Father in February 2016 in an effort to gain greater compliance. The case manager and Father agreed to focus exclusively on parenting skills and relationship building with the Child. The new focus was expected to start March 1, 2016. (State's Exhibit 30).

18.  Father kept all four scheduled appointments with Fatherhood Engagement in March 2016.  He was much more engaged with the focus on the Child rather than Father's individual issues of responsibilities, independence and self-care. (State's Exhibit 31).

19.  At the Permanency Hearing for the Child on April 12, 2016, Mother and Father presented a bleak outlook that reunification could be achieved. . . .

20.  Father's circumstances were equally bleak.  He had not completed the necessary services ordered in the Dispositional Decree and Parental Participation Order.  The psychological evaluation had yet to be completed.  The need for anger management continued to be relevant.  The FCM had two additional encounters with Father that she perceived to be hostile.  The Court's findings from the hearing specifically noted "It's to the point where [Father]'s persistent questioning as to why he has requirements asked of him and his clear displeasure with the assigned family case manager has stalled any progress by him in demonstrating that he can be a permanency plan for his son." (State's Exhibit 24).

21.  Father completed the psychological evaluation on May 31, 2016.  Father was given the following diagnoses:  borderline intellectual functioning and unspecified personality disorder, with narcissistic and antisocial features.  Dr. McIntire recommended that Father complete anger management, engage in case management to encourage independence and self-responsibility, engage in a parenting curriculum, and desist the use of Xanax, as it is a highly addictive drug and Father does not have anxiety.  Dr. McIntire concluded that Father would be unable to care for a child by himself with his current behavioral issues. (State's Exhibit 46).

22.  In particular, Dr. McIntire noted:

Relative to parenting, his psychological testing is not promising. His characterological disorder makes him a poor candidate to parent, due to his self-focus, immaturity, impulsive and aggressive tendencies, and lack of empathy. As already noted, his Borderline Intellectual Functioning is a serious barrier to independent parenting, and the combination of his two diagnoses paints a grim prognosis, as his personality problems preclude him from asking for feedback or assistance in admitting his limitations. His CAPI score could not be determined due to his very defensive approach. His edgy, inpatient, and blaming presentation with various providers, including this psychologist, as well as a history of aggressive behaviors, is additionally concerning relative to his ability to safely and appropriately guide a young boy through the difficult interactions of childhood and adolescence.

23. Father completed four sessions of anger management and did not return. The referral for anger management closed on August 31, 2016, due to nonattendance. FCM provided a second referral for anger management on October 5, 2016. Father declined to participate.

24. From removal in April 2015 through the summer of 2016, information was also gained about the Child's condition.

25. At the Dispositional Hearing, the Child was identified for speech therapy and case management services. (State's Exhibit 12).

26. Before starting the case management services, the Child completed a general mental health needs assessment (MRO). The Child received a diagnosis of adjustment disorder with some anxiety present. Contributing factors were believed to be domestic violence he had witnessed in his home and the circumstances related to his removal. (State's Exhibit 14).

27. The Child was initially placed in relative care with maternal family. The relative placement reported the Child urinating on bathroom walls and making statements of wanting to kill everyone. (State's Exhibit 14).

28. From the MRO, the Child was recommended for therapy to address anger and behaviors. The Child was referred to services with Adult and Child.

29. In November 2015, the Child was placed in the home of his paternal grandmother, where Father also resided. Father and grandmother were given referrals for the Child to continue his therapy with Adult and Child in their community of Indianapolis.

30. The Child was removed from the home of his paternal grandmother on or about April 5, 2016 due to several concerns. Safety became a concern for the FCM during two attempts to visit the home. Father was unable to have professional communication with the FCM during one of the attempted visits. During a subsequent visit, the FCM perceived Father to be threatening and intimidating. In addition, Father and paternal grandmother had failed to initiate the required therapy for the Child. Two referrals had been made for the therapy, with both closing for lack of contact. (State's Exhibit 23).

31. After removal from relative placement with paternal grandmother, the Child was placed in foster care. The foster parents sought further evaluation of the Child due to concerns of significant developmental delays.

32. The foster parents noted that when the Child came into their care at approximately five years of age, he did not know any colors, shapes, or letter sounds. This was after the Child had been in relative placement with Father in the home for approximately four months.

33. The Child also came into the foster home with deficits in fine motor skills. The Child required a high level of supervision to insure his safety. The Child was first thought to be accident-prone.

34. The Child actually has a preliminary diagnosis of Asymmetrical Tonic Neck Reflex, something he should have outgrown at six months of age. The condition does result in lack of balance, ADHD like symptoms, vision difficulties and coordination issues. (CASA Report).

35. Dr. Kristen Hurley of Estes Neuropsychology completed an assessment of the Child on November 2, 2016. Dr. Hurley noted that the Child had no intellectual disabilities, and his delays were due to a non-stimulating environment, that did not encourage growth or learning. (State's Exhibit 27).

36. The Child receives intense treatment, which includes physical therapy, occupational therapy, and speech therapy.

37. Father has been unable to recognize that the Child has any delays.

38. Father has struggled in understanding the Child's deficits and the level of supervision required for the Child's safety.

39. Fatherhood Engagement had an opportunity to discuss the findings of Father's psychological evaluation and the findings regarding the Child in July 2016. Father took issue with the Child's findings. The caseworker discussed the need for Father to be able to learn in the CHINS case. Father was advised to meet with the FCM in order to clearly understand what was preventing placement of the Child with Father. Second, Father was advised to address any of the noted concerns without argument. Father continued to express displeasure with his psychological evaluation findings and continued to dispute any potential diagnosis the Child could have. The caseworker ended

the conversation by pointing out to Father that his comments were examples of Father's inability or unwillingness to address his issues along with an unwillingness to understand the Child's needs.

40. Father failed to engage in any services with Fatherhood Engagement in August 2016. His referral closed the month of August due to nonattendance. FCM provided a third referral for Fatherhood Engagement on October 14, 2016. Father declined to participate.

\* \* \*

45. Neither parent has ever been permitted unsupervised Visitation since the child's original removal.

\* \* \*

47. Father's visitation with the Child was inconsistent. Family Case Managers noted that Father would be cyclical as to his participation in visits. There were times when he would not see the Child for a month at a time and following some discussion with Father, he would improve in his attendance for six weeks or so. He was initially provided two supervised visits per week. By January 2016, the visit frequency was reduced to one time to per week due to nonattendance. The visits returned to two times per week in May 2016 but then attendance again became inconsistent. The visitation supervisor assigned to Father's visits reported that between April 2015 to November 2016, Father attended about 75% of his scheduled visits.

48. There is an observable bond between Father and the Child.

49. Father has failed to put the child's needs before his own. Father has never traveled to the town where the Child is placed to have visits. This was specifically suggested to Father and

memorialized in a Court Order from a hearing held on July 27, 2015. Father was specifically asked to think about how he could help in reducing the travel the Child had to undergo, often on consecutive days, to visit with him. Father was encouraged to share in the driving for the visits or to consider a location that would shorten the distance for visitation. Father never acted upon any of the suggestions. In addition, at times Father confirmed and then cancelled visits with the Child, even when the Child was in route to see Father. (State's Exhibit 14).

50. Dr. Linda McIntire's report noted that individuals with Father's diagnoses are unable to prioritize the needs of children over themselves and have difficulty empathizing with others.

51. Father testified that he does not believe that his completion of an anger management program or Fatherhood Engagement could have benefitted the Child.

52. The Child has an older half sibling. She joined the foster home with the Child on August 18, 2016.

53. The family therapist testified that many adults have disappointed the Child in his young life, and that severing the relationship between the Child and the Child's older sibling could cause a regression in the Child's emotional and psychological well-being, as the Child's relationship with [his] older sibling has been a constant and consistent relationship.

54. The foster parents desire to adopt both the Child and his half sibling.

\* \* \*

56. Mother and Father have failed to support the Child during the life of the case.

57. Father has lived with his mother and stepfather through the life of the CHINS case. He has a source of income with SSI but acknowledged during his psychological evaluation that he cannot live off his SSI. He has shown no motivation for employment, other than seasonal work with his father, which allows him to forego working when experiencing anxiety.

58. Mother and Father have failed to make any notable progress under the case plan.

59. The Child is thriving in a loving, structured and stable home. The Child has made gains while in the foster home. One simple example is his participation in soccer. The Child played soccer for the first time and was the team's top scorer. As noted by the CASA, just six short months earlier, the Child could not run without falling.

60. DCS' plan for Child is that he be adopted by his current foster parents.

61. The CASA also supports adoption by the foster parents as the permanency plan for the child.

Appellant's App. Vol. 2 at 49-56. This appeal ensued.[3]

# Discussion and Decision

[4] We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe*

---

[3] Mother does not participate in this appeal.

*Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[6] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[7] Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[8] On appeal, Father raises a single dispositive issue for our review, namely, whether the trial court erred when it concluded that the conditions that resulted in Child's removal and the reasons for his placement outside of Father's home will not be remedied.[4] In essence, Father maintains that, because the reasons for Child's removal were based on Mother's heroin addiction, which had nothing to do with Father, DCS cannot show that the conditions that resulted in Child's removal from *his* care would not be remedied. But Father's argument misses the mark.

[9] This court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. and Children (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, the trial court properly considered the conditions leading to the continued placement outside of Father's home rather than simply focusing on the basis for the initial removal of Child. Father does not challenge the trial court's findings underlying its conclusion on this issue.

---

[4] Because the statute is written in the disjunctive, and because we hold that the court's conclusion on this issue was not erroneous, we need not address Father's contention that the court erred when it concluded that continuation of the parent-child relationship poses a threat to Child's well-being. I.C. § 31-35-2-4(b)(2). And Father does not dispute the court's conclusions relevant to the other subsections of the statute, such as Child's best interests.

[10] And the evidence supports the trial court's findings and conclusion. To determine whether there is a reasonable probability that the reasons for Child's continued placement outside of Father's home will not be remedied, the trial court should judge Father's fitness to care for Child at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[11] The trial court found, and the evidence supports, that Father: did not successfully complete programs for anger management and denies having anger problems; did not successfully complete Fatherhood Engagement; disagrees with the results of his psychological evaluation; is unable or unwilling to address Child's special needs; has had inconsistent visitation with Child and has never had unsupervised visitation; does not put Child's needs before his own needs; and sees no benefit to Child of Father's participation in anger management. Father's habitual patterns of conduct demonstrate that he is

unlikely to make the necessary effort to be a suitable parent to Child. Thus, we cannot say that the trial court clearly erred when it concluded that the reasons for Child's continued placement outside of Father's home will not be remedied.

[12] Affirmed.

Crone, J., and Pyle, J., concur.