# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 04 2019, 9:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel Hageman
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of I.B., J.S., and S.B. (Minor Children); <br><br> J.M.S. (Father), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | December 4, 2019 <br><br> Court of Appeals Case No. 19A-JT-1454 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Scott B. Stowers, Magistrate <br><br> Trial Court Cause No. 49D09-1808-JT-919 49D09-1808-JT-920 49D09-1808-JT-921 |

**Najam, Judge.**

## Statement of the Case

J.M.S. ("Father") appeals the trial court's termination of his parental rights over his minor children I.B., J.S., and S.B. ("Children"). Father presents a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of his parental rights. We affirm.

## Facts and Procedural History

Father and A.B. ("Mother") have three children together: I.B., born July 24, 2014; J.S., born April 23, 2016; and S.B., born July 11, 2017. When S.B. was born, he tested positive for amphetamine and methamphetamine, and DCS removed him from Mother's home on an emergency basis. Father's whereabouts were unknown. On July 17, 2017, DCS filed a petition alleging that all three Children were Children in Need of Services ("CHINS") due to the drugs in S.B.'s system at birth, the family's prior DCS history, both parents' history of untreated substance abuse, and because Father's whereabouts were unknown. On that date, the trial court removed Children from Mother and Father's care and placed them in foster care.

On September 12, the trial court found Children to be CHINS with respect to Mother, and on November 14, the trial court found Children to be CHINS with respect to Father. On November 28, the trial court entered a dispositional decree, whereby the court ordered Father to abstain from using illegal controlled substances; participate in home-based therapy and follow all

recommendations; complete a substance abuse assessment and follow all recommendations; submit to random drug screens; and successfully complete a Father Engagement Program. Father failed to comply with any of the court-ordered services other than submitting to a single drug screen, which came back positive for an undisclosed substance.

[4] In December 2017, Father violated the terms of his probation, which he was serving after pleading guilty to robbery. In January 2018, Father was incarcerated. While in prison, Father was able to participate in a program called "Thinking for a Change," and he obtained his GED. Tr. at 137. Father also engaged in a Father Engagement program while he was incarcerated, and he was able to participate in FaceTime calls with Children regularly until November, when the person facilitating those calls, Kevin Tichenor, transitioned to another job outside of the prison.

[5] In the meantime, in August 2018, DCS filed petitions to terminate Father's parental rights over Children.[1] Following a hearing, the trial court granted the termination petitions on May 20, 2019. In support of its order, the trial court entered the following findings and conclusions:

> 9. The children have been placed in Foster Care since April 2018. They are placed together in the same home where they are bonded and doing well. This is a preadoptive placement. The

---

[1] Mother voluntarily terminated her rights over Children.

foster home is appropriate. Each child has their own room and the home has a fenced in backyard.

10. [J.S.] was developmentally behind when she arrived in Foster Care, but has made great progress and is now doing well.

11. The children perceive their foster parents as their fathers and refer to their foster father as "dad."

12. [Father] is currently incarcerated in Putnamville Correctional Facility. He has been there since early 2018.

13. [Father] has passed the GED test, and now anticipates being released on May 30, 2019.

14. [Father] has prior DCS History, including a 2015 CHINS Petition filed on [I.B.] which resulted in a CHINS adjudication under Cause Numbers 49D09-1504-JC-001201 and 49D09-1605-JC-001618. That case was closed on December 16, 2016 when the children were reunified with their mother. [Father's] whereabouts were unknown at that time and he had not participated in services.

15. Another CHINS Petition was filed on [I.B. and J.S.] in February 2017 under Cause Numbers 49D09-1702-JC-000367-8. That case resulted in a "no CHINS" finding after a February 3, 2017 Fact Finding Hearing.

16. [Father] has a significant criminal history.

17. [Father] has been incarcerated on several occasions and has spent approximately 450 days in jail or prison since his oldest child [I.B.] was born in 2014.

18. [Father] has never had a drivers license. He has admitted to driving the children around without a license.

19. Despite pleading guilty to battery in 2015, [Father] insists the charges are the fault of the children's mother.

20. [Father] did participate in Father Engagement while incarcerated at Putnamville. Other than that, he has not participated in any Court ordered services.

21. Sara Hutson of Families First provided Home Based Therapy to [I.B.] for a few months ending in June 2018.

22. Ms. Hutson was referred to assist [I.B.] in building healthy attachments to her foster parents.

23. [I.B.] participated in "play therapy" with Ms. Hutson.

24. Ms. Hutson observed some concerning behaviors in [I.B.] including acting out fights between her mother and men.

25. Ms. Hutson had approximately sixteen (16) sessions with [I.B.] and the child only mentioned [Father] two times.

26. [I.B.] was able to build a healthy attachment with her foster parents.

27. Ms. Hutson has observed [I.B.] to be very well attached to her foster parents and believes that any parenting time would be disruptive to her attachment to her foster parents.

28. The children had been removed from their father's care and custody pursuant to a Dispositional Decree for at least six (6) months prior to this Termination Action being filed on August 3, 2018.

29. [Father's] whereabouts were unknown when the CHINS case originated. He was later located living in a motel.

30.     [Father] only submitted to one (1) drug screen under the CHINS case.  It was positive for an undisclosed substance.

31.     FCM Whittaker [r]eferred [sic] Families First to provide a Substance Abuse Assessment for [Father] on August 24, 2017.  [Father] did not complete it.

32.     FCM Whittaker referred Home Based Therapy for [Father] on November 30, 2017.  This referral was unsuccessfully closed due to lack of participation.

33.     FCM Whittaker referred Family and Community Partners to provide Father Engagement for [Father] on November 30, 2017.

34.     [Father] was unsuccessfully discharged from Father Engagement for lack of compliance.

35.     FCM Whittaker did re-refer Father Engagement for [Father] when he was incarcerated at Putnamville.  [Father] did participate in Father Engagement with Kevin Tichenor while incarcerated.

36.     [Father] did not participate in parenting time with the children before his incarceration.  He did participate in parenting time with the children while incarcerated via FaceTime during sessions with Mr. Tichenor.

37.     [Father's] FaceTime visits occurred beginning in July 2018 and the last one was the day before Thanksgiving.

38.     [Father] was cooperative with Father Engagement with Mr. Tichenor.  The service ended in December 2018 when Mr. Tichenor transferred into other duties.

39.     Most of the FaceTime parenting time were with [I.B. and J.S.]  [Father] had very little engagement with [S.B.]

40.     Although [Father] is due to be released from prison in approximately one month, he has no practical plan for stability upon his release.

41.     Although Mr. Tichenor observed a bond between [Father] and [I.B. and J.S.], he has noted that it is obvious that the children were "emotionally removed" from their father.

42.     Mr. Tichenor observed no bond between [S.B. and Father] and has stated that [Father] doesn't have much of a relationship with [S.B.]

43.     There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside of the home will not be remedied by their father. [Father] has not demonstrated an ability or willingness to properly parent the children. Despite referrals, [Father] has not completed services designed to enhance his ability to parent. He has disregarded orders and has not participated in regular drug screens. He had several weeks before his most recent incarceration and failed to participate.

44.     Continuation of the parent-child relationship poses a threat to the safety and well-being of the children in that it would serve as a barrier for them obtaining permanency through an adoption when their father is unwilling and unable to offer permanency and parent. He has only had contact with the children via FaceTime for the past year and none since November 2018.

45.     Termination of the parent-child relationship is in the children's best interests. Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met.

46.     There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

47. The Guardian ad Litem agrees with the permanency plan of adoption as being in the children's best interests.

Appellant's App. Vol. 2 at 113-14.  This appeal ensued.

# Discussion and Decision

## *Standard of Review*

[6] Father contends that the trial court erred when it terminated his parental rights. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*.  However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).  Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[7] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> * * *

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2019). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[8] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[9] Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[10] On appeal, Father contends that the trial court erred when it found that "he has no practical plan for stability upon his release" from prison. Appellant's App. Vol. 2 at 114. Father also contends that the trial court erred when it concluded that: (1) the conditions that resulted in Children's removal and the reasons for their placement outside of his home will not be remedied; (2) there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children; and (3) termination is in Children's best interests. However, as Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address the issue of whether there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children.

## *Father's Plan for Stability*

[11]　Father first contends that the trial court's finding that he had no plan for stability upon his release from prison is clearly erroneous. Father maintains that he testified that he had a job lined up with his father's carpet-cleaning business and that his father would help him find housing. Father asserts that DCS did not present any evidence to contradict Father's testimony on this issue.

[12]　However, as DCS points out, Kevin Tichenor testified that Father's future plans seemed "sketchy" in that Father did not take "practical steps" to make a plan for the future. Tr. at 118-19. And Tichenor testified that Father never told him about a plan to work for his father's business. On different occasions, Father mentioned that he might move to Florida or stay in Indiana. Thus, the evidence supports the trial court's finding that Father had "no practical plan for stability upon his release." Appellant's App. Vol. 2 at 114.

## *Reasons for Children's Placement Outside of Father's Home*

[13]　Father contends that DCS did not present sufficient evidence to prove that the reasons for Children's placement outside of his home will not be remedied. In particular, Father points out that, at the time of the final hearing, he was "within days of his release from DOC." Appellant's Br. at 13. And Father maintains that, while incarcerated, he "participated in services designed to enhance his ability to parent and made efforts to better his life." *Id.*

[14]     This court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, the trial court properly considered the conditions leading to the continued placement outside of Father's home, including Father's incarceration. Father does not challenge the trial court's findings underlying its conclusion on this issue.

[15]     And the evidence supports the trial court's findings and conclusion. To determine whether there is a reasonable probability that the reasons for Children's continued placement outside of Father's home will not be remedied, the trial court should judge Father's fitness to care for Children at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule

out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[16] The trial court found, and the evidence supports, that: Father has a significant criminal history, and he has been incarcerated for approximately 450 days since I.B. was born in 2014; Father blames Mother for his history of domestic violence; Father did not participate in any court-ordered services prior to his incarceration in January 2018 other than a single drug screen, which showed a positive result for an undisclosed substance; and Father never provided DCS with certificates to show completion of any services. The trial court also found that Father "has not demonstrated an ability or willingness to properly parent the children." Appellant's App. Vol. 2 at 114.

[17] Father attempts to analogize the facts and circumstances of the termination of his parental rights with those in another case, *R.Y. v. Indiana Department of Child Services (In re G.Y.)*, where our Supreme Court reversed the termination of an incarcerated Mother's parental rights over her child. 904 N.E.2d 1257 (Ind. 2009). But in *In re G.Y.*, prior to her incarceration and during G.Y.'s entire life, Mother was the sole caretaker of G.Y. and led a law-abiding life up to the time of the offense that resulted in her incarceration. In contrast, here, Father's whereabouts were unknown at the time the CHINS petitions were filed in this case, and Father has engaged in repeated criminal conduct resulting in approximately 450 days of incarceration since 2014. Finally, the mother in *In re G.Y.* participated in individual therapy, substance abuse treatment, a parenting class, an associate's degree, and a job placement program. Here, Father

testified that he was unable to obtain substance abuse treatment while incarcerated, but he did not explain why his participation in programs through the DOC was otherwise relatively limited.

[18] While we laud Father's efforts to maintain contact with Children while incarcerated and his participation in programs to better himself, we cannot say that that evidence outweighs Father's habitual patterns of conduct. Father's argument on appeal is simply an invitation for this Court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Based on the totality of the circumstances, we hold that the trial court's findings support its conclusion that the conditions that resulted in Children's removal and the reasons for their placement outside of his home will not be remedied.

### Best Interests

[19] Father also contends that the trial court erred when it concluded that termination of his parental rights is in Children's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A parent's historical inability to provide "adequate housing, stability, and supervision," in addition to the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *Id*.

[20] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*,

906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id*. Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[21] Here, as the trial court's findings demonstrate, Father has not shown that he is capable of parenting Children. Father did not participate in court-ordered services during the "several weeks" between the dispositional order and his incarceration, including failure to participate in visitation with Children. Appellant's App. Vol. 2 at 114. Perhaps most telling is Father's failure to establish and maintain any contact with Children after his FaceTime visits ended in November 2018. There is no evidence that Father's incarceration prevented him from calling Children or sending them cards or letters during the more than three months before the final hearing in March 2019. Children have lived with their foster parents since April 2018, and they are bonded and thriving. The CASA recommended termination of Father's parental rights. Given the totality of the evidence, Father cannot show that the trial court erred when it concluded that termination of his rights was in Children's best interests.

[22] Affirmed.

Vaidik, C.J., and Tavitas, J., concur.