

FILED
Aug 25 2020, 8:24 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT B.C.

David W. Stone IV
Anderson, Indiana

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent–Child Relationship of C.C. (Minor Child)<br><br>and<br><br>B.C. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | August 25, 2020<br><br>Court of Appeals Case No. 20A-JT-289<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable G. George Pancol, Judge<br><br>Trial Court Cause No. 48C02-1904-JT-185 |

**Bradford, Chief Judge.**

Court of Appeals of Indiana | Opinion 20A-JT-289 | August 25, 2020    Page 1 of 26

# Case Summary

B.C. ("Father") and B.H. ("Mother") are the biological parents of C.C. ("Child"), born May 18, 2011. In April of 2019, the Department of Child Services ("DCS") petitioned for the termination of Father's parental rights. In December of 2019, the juvenile court ordered that Father's parental rights to Child be terminated. Father contends that the juvenile court's termination of his parental rights was clearly erroneous. We affirm.[1]

# Facts and Procedural History

In October of 2017, DCS removed Child from Mother's care due to her substance abuse, and Child was placed with Father. On October 11, 2017, DCS petitioned to have Child adjudicated a child in need of services ("CHINS"). In December of 2017, the juvenile court adjudicated Child to be a CHINS. On January 22, 2018, the juvenile court held a dispositional hearing, at which it ordered Father to maintain contact with DCS, notify DCS of any address or phone number changes within forty-eight hours, keep all appointments with DCS and services providers, care for Child and meet all Child's medical and mental health needs, allow DCS to visit his home, enroll in any programs recommended by DCS, abstain from using illegal substances and obey the law, and submit to random drug screens.

---

[1] Mother voluntarily terminated her parental rights and does not participate in this appeal.

In February of 2018, Father left Child with maternal great-grandmother, stating that "he was done with placement and court orders," leading to Child's placement in his current foster home. Tr. Vol. II p. 38. On April 18, 2019, DCS petitioned for the termination of Father's parental rights to Child. On July 16 and September 10, 2019, the juvenile court held an evidentiary hearing regarding DCS's termination petition. Following the evidentiary hearing, the juvenile court made, in relevant parts, the following findings of fact:

> 10.) The [CHINS] Court conducted a periodic review hearing on April 4, 2018, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.
>   a. [Mother] failed to appear in person, but was represented by counsel, John Reeder.
>   b. [Father] appeared in person and by counsel, Alan Miller.
>   c. [Child] has been out of the home since [Father] packed up his son's belongings and dropped them and [Child] off at grandmother's home, and continued removal is in [Child's] best interest.
>   d. Both [Mother] and [Father] failed to comply with services, enhance their ability to parent, or consistently visit the child.
>   e. [Mother] passed no screens, made no visits with [Child,] nor completed any services prior to her arrest and has been incarcerated for approximately three months.
>   f. [Father] attempted no services and made no efforts to visit [Child] since dropping [Child] off with grandmother.
>   g. The matter was set for a permanency hearing on September 19, 2018.
> 11.) The [CHINS] Court conducted a hearing on [Father's] Motion to Review Placement on June 5, 2018, making the following findings from which the Court finds the following facts and inferences for the purpose of the termination proceedings.
>   […]
>   c. The Court denied [Father's] request, and ordered [Father] to have supervised visitation with [Child] for 30 days.

d. The Court granted the request for Modification filed by DCS and ordered family and individual counseling for [Child].

e. Additionally [Father] was ordered to have random drug screens and if he intends to pursue placement of the child, he is to attend parenting classes and individual therapy.

12.) The [CHINS] Court conducted a hearing on DCS's Motion to Rescind Visitation on September 10, 2018, making the following findings from which the Court finds the following facts and inferences for the purpose of the termination proceedings.

[…]

c. The parties agreed that [Father's] visitation would remained [sic] therapeutic and supervised and he would remain in contact with DCS and its service providers.

13.) The [CHINS] Court conducted a permanency hearing on September 19, 2018, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.

[…]

c. [Child] has been out of [Mother's] home for 11 months, [Father's] home for 7 months, and continued removal is in [Child's] best interest.

d. [Father] had placement of [Child] until he dropped [Child] off with current placement and now he is not participating in any services including refusing to engage in supervised visitation with [Child].

[…]

14.) The [CHINS] Court conducted a periodic review hearing on March 11, 2019, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.

[…]

e. [Father] completed no services during the period and the only contact between him and DCS was a meeting at which [Father] informed DCS that he did not believe he had to participate in any services.

f. DCS explained the dispositional orders again to [Father] at that meeting and submitted new referrals for parenting classes for [Father].

g. The matter was set for a permanency hearing on September 4, 2019.

[…]

16.) The [CHINS] Court conducted the fact-finding on the termination petition conducted on July 16, 2019, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.

[…]

c. Partial evidence was taken to open the proceedings, and the matter was continued until September 10, 2019.

d. Family Case Manager Marlena Bertram testified that:

i. Marlena Bertram, an employee of the Madison County office of [DCS,] is the current permanency family case manager for the minor child.

ii. [Child] is a minor child born May 18, 2011.

iii. [Mother] is the biological mother of [Child].

iv. [Father] is the biological father of [Child].

v. The case began in Anderson, Indiana when [Child] was detained from [Mother] on October 6, 2017.

[…]

17.) The [CHINS] Court conducted a permanency hearing on September 4, 2019, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.

[…]

b. [Child] has been out of [Mother's] home for 23 months, [Father's] home for 18 months, and continued removal is in [Child's] best interest.

c. [Mother] was incarcerated for violating work release with a positive drug screen and has signed a consent to adopt [Child].

d. [Father] has completed no drug screens and been closed out for non-compliance thrice this period.

e. [Father] has been twice closed out of home-based casework and is not participating in his third referral this period for that service.

[…]

19.) At the trial on the termination petition conducted on September 10, 2019, at which Marlena Bertram, Permanency Family Case Manager testified. The Court makes the following

findings and reasonable inferences from this testimony for purposes of these termination proceedings.

[…]

d.  [Child] was removed from [Mother's] home in Anderson for overdosing and becoming incarcerated 23 months prior and placed with [Father] on October 6, 2017.

e.  [Child] was no longer with [Father] as of February of 2018.

f.  [Father] did not want to participate in services as ordered by the CHINS Court as part of the dispositional decree and packed up [Child's] things and dropped him off at his Grandmother's home.

g.  At that time, [Father] made statements to the effect that he was done being placement and done being ordered to do services.

h.  At no point has [Child] ever been returned to [Mother's] care and has been out of [Father's] care since February 5, 2018.

i.  [Child] has been out of the home at least 15 of the last 22 months.

j.  [Child] was adjudicated a [CHINS] in Madison County and the certified records of the underlying CHINS matter were entered into record without objection.

k.  The [CHINS] Court issued the Dispositional Decree on January 22, 2018 and FCM Bertram is family with the dispositional orders.

l.  The permanency plan at the time of the Dispositional Hearing was reunification.

m.  The plan was changed to include a concurrent plan of adoption on September 19, 2018.

n.   It has been 20 months since the dispositional decree.

o.  FCM Bertram did not author the dispositional report, but is familiar with it.

p.  FCM Bertram offered services designed to remedy the reasons for removal to [Father] and ordered by the CHINS Court.

q.  [Father] has allowed FCM Bertram to visit his home, which is appropriate except [Father] did not even have a bed or bedding for [Child] when FCM Bertram last visited the home.

r.   [Father] has not cared for [Child] in that:

    i.  [Father] packed up [Child's] belongings and dropped [Child] off less than a month after the dispositional decree was made.

    ii.  [Father] did not even have a bed or bedding for [Child] when FCM Bertram last visited the home.

    iii.  [Father] never completed any parenting education program.

s.  [Father] failed to enroll in recommended services, or keep appointments with DCS, providers, or CASA as ordered.

t.  [Father] was repeatedly closed out of home maker and home-based casework services.

u.  [Father] screened for FCMs, but not for a provider. His certified drug screens which were submitted into evidence without objection showed:

    i.  June 5, 2018–Positive for 198.5 ng/mL of amphetamine and 493.2 ng/mL of methamphetamine

    ii.  June 29, 2018–Negative for all substances

    iii.  July 10, 2018–Negative for all substances

    iv.  July 13, [2018]–Positive for 10.0 ng/mL of amphetamine and 33.3 ng/mL of methamphetamine

    v.  July 19, 2018–Positive for 44.2 ng/mL of amphetamine and 206.1 ng/mL of methamphetamine

    vi.  July 24, 2018–Positive for 32.0 ng/mL of amphetamine and 44.1 ng/mL of methamphetamine

v.  FCM Bertram could not say if [Father] abstained from alcohol or drugs as he refused any further screens after July of 2018.

w.  [Father] did not complete parenting classes as those were part of the home-based casework services.

x.  FCM Bertram has visited [Child] in his placement and found placement and placement's home to be suitable and appropriate for the care of [Child].

y.  [Child] is doing well in placement's home and care.

z.  There is no reasonable probability the conditions which led to removal will be remedied.

aa.  Termination of the parent-child relationship is in the child's best interest.

bb.  A satisfactory plan of adoption exists for the care and treatment of the minor child.

20.) At the trial on the termination petition conducted on September 10, 2019, at which Shelly Ramsey testified. The Court

makes the following findings and reasonable inferences from this testimony for the purposes of these termination proceedings.

    a. Shelly Ramsey is employed as a therapist at the Children's Bureau.

    b. Ms. Ramsey is familiar with [Child] as she is his individual therapist.

    c. Ms. Ramsey also began providing therapeutic supervised visits for [Child] and [Father] on July 15, 2019.

    d. Ms. Ramsey believes [Child] loves both of his parents.

    e. During visitation [Child] spends most of his time playing with his cousin, and little time interacting with [Father].

    f. [Child] has abandonment issues, specifically related to [Father].

    g. [Child] had significant behaviors, but those have improved significantly since he has been with placement.

21.) At the trial on the termination petition conducted on September 10, 2019, at which [Alfred Cole] testified. The Court makes the following findings and reasonable inferences from this testimony for the purposes of these termination proceedings.

    a. [Alfred Cole] is employed as a home-based caseworker at Seeds of Life.

    b. Mr. [Cole] is not familiar with [Father,] but knows his name as he has had three referrals to provide home-based casework to [Father,] since March of 2019.

    c. [Father] has never responded to Mr. [Cole's] repeated efforts to reach out to [Father] and begin services.

    d. Mr. [Cole] was to provide parenting education as part of his services.

22.) At the trial on the termination petition conducted on September 10, 2019, at which Michael Dockery testified. The Court makes the following findings and reasonable inferences from this testimony for the purposes of these termination proceedings.

    a. Mr. Dockery is the pre-adoptive kinship placement for [Child].

    b. Mr. Dockery was bonded with [Child] before placement as he is the father of [Mother's] former paramour.

    c. Mr. and Mrs. Dockery are financially stable and are willing and able to meet [Child's] ongoing needs.

    d. Mr. Dockery's home is appropriate for raising [Child].

e. [Child] is doing well in school and is involved in extracurricular activities.

f. Mr. Dockery is willing to adopt [Child] if parental rights are terminated.

23.) At the trial on the termination petition conducted on September 10, 2019, at which Nellie Elsten, CASA testified. The Court makes the following findings and reasonable inferences from this testimony for the purposes of these termination proceedings.

a. Ms. Elsten is the CASA for [Child] and she is familiar with the case.

b. There is no reasonable probability the conditions which led to removal will be remedied[] because Mother consented to adoption and [Father] abandoned [Child] and has made no real effort to get him back.

c. A satisfactory plan of adoption exists for the care and treatment of [Child].

d. Ms. Elsten has been to the Dockery home and found it is appropriate and the Dockerys are appropriate caregivers.

e. Termination of the parent-child relationship and adoption of [Child] by the Dockerys is in [Child's] best interest.

24.) At the trial on the termination petition conducted on September 10, 2019, at which [Father] testified. The Court makes the following findings and reasonable inferences from this testimony for the purposes of these termination proceedings.

a. [Father] is the biological father of [Child].

b. [Father] testified he has a bed for [Child], but it just is not currently inside the home.

c. [Father] testified he did not abandon his son and that it was all misunderstanding, but this court finds that claim unbelievable since placement and visitation were litigated multiple times.

d. [Father] last requested placement of [Child] more than a year prior to the fact-finding hearing on termination of parental rights.

25.) The Court now adopts each of the facts elicited above as its own findings upon due consideration of the testimony and evidence presented, and as individual bases for its judgment in this case.

Appellant's App. pp. 7–14. Based on its findings, the juvenile court ordered Father's parental rights to Child be terminated on December 10, 2019.

# Discussion and Decision

[4]     Father challenges the juvenile court's findings 20f, 20g, 21c, and 24c. First, regarding findings 20f and 20g, our review of therapist Ramsey's testimony as a whole leads to reasonable inferences supporting those findings. Moreover, finding 21c is supported by the testimony of Alfred Cole, during which he stated that he tried to contact Father by texting and calling him and stopping by his apartment. Finally, Father challenges the part of finding 24c which states that "placement and visitation were litigated multiple times." Given that there were petitions for placement change and visitation modification litigated throughout this matter, we find there is evidence to support this partial finding. Father's challenges are merely an invitation to reweigh the evidence and judge witness credibility, which we will not do. *Doe v. Daviess Cty. Div. of Children & Family Servs.*, 669 N.E.2d 192, 194 (Ind. Ct. App. 1996), *trans. denied*.

[5]     That said, the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "Though it's been oft-stated, it bears repeating: the parent–child relationship is one of the most valued relationships in our culture." *Matter of M.I.*, 127 N.E.3d 1168, 1170–71 (Ind. 2019) (internal quotations and citations omitted). Parental rights, however, are not absolute and must be subordinated

to the child's interests when determining the proper disposition of a petition to terminate the parent–child relationship. *Bester*, 839 N.E.2d at 147. Therefore, when parents are unwilling or unable to fulfill their parental responsibilities, their rights may be terminated. *Id.*

[6] In reviewing the termination of parental rights on appeal, we neither reweigh the evidence nor judge the credibility of witnesses. *Doe*, 669 N.E.2d at 194. We consider only the evidence and reasonable inferences therefrom which are most favorable to the juvenile court's judgment. *Id.* Where, as here, a juvenile court has entered findings of facts and conclusions of law, our standard of review is two-tiered. *Id.* First, we determine whether the evidence supports the factual findings, second, whether the factual findings support the judgment. *Id.* The juvenile court's findings and judgment will only be set aside if found to be clearly erroneous. *Id.* A finding is clearly erroneous if no facts or inferences drawn therefrom support it. *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005). "A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment." *Id.* When the juvenile court's findings are unchallenged on appeal, we accept them as true. *See In re S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019).

[7] Indiana Code section 31-35-2-4(b) dictates what DCS is required to establish to support a termination of parental rights. Of relevance to this case, DCS was required to establish by clear and convincing evidence

  (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2).[2] In challenging the sufficiency of the evidence to sustain the termination of his parental rights, Father contends that the juvenile court erred by concluding that there was a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home of the parents would not be remedied.

[8] Because Child was in Mother's care when he was initially removed, we focus our review on Father's failure to remedy the conditions that justified Child's continued placement outside of his home.

> To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the [juvenile] court must judge a parent's fitness to care for [his child] at the time of the termination hearing and take into consideration evidence of changed conditions. However, the [juvenile] court must also

---

[2] It is not disputed that Child had been removed from Father's care for at least six months under a dispositional decree, that termination was in Child's best interests, and that there was a satisfactory plan for the care and treatment of Child, all required findings pursuant to Indiana Code section 31-35-2-4(b)(2).

> evaluate the parent's habitual patterns of conduct to determine
> the probability of future neglect or deprivation of the child.

*In re Termination of Parent–Child Relationship of D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (cleaned up), *trans. denied*. DCS was not required to rule out all possibilities of change, but, rather, needed only to establish that there is a reasonable probability that Father's behavior will not change. *In re B.J.,* 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[9] We conclude that DCS produced ample evidence to establish a reasonable probability that the reasons for continued placement outside of Father's home would not be remedied. At the January of 2018 dispositional hearing, the juvenile court ordered Father to maintain contact with DCS, notify DCS of any address or phone number changes within forty-eight hours, keep all appointments with DCS and services providers, care for Child and meet all Child's medical and mental health needs, allow DCS to visit his home, enroll in any programs recommended by DCS, abstain from using illegal substances and obey the law, and submit to random drug screens. FCM Bertram testified that Father has failed to maintain communication with DCS, *i.e*, failing to reply to text messages and letters from FCM Bertram. FCM Bertram also testified that Father has failed to complete services, stating that "[h]e did not participate in the home-based services which is the home-based caseworker and home maker referrals. He did not do the drugs screens[,]" and "[h]e did not complete the parenting classes that were provided through the home-based referrals, nor the substance abuse assessment." Tr. Vol. II pp. 41, 43. Moreover, home-based

caseworker Cole testified that he was supposed to provide services to Father, but Father failed to contact him even after Cole texted and called him and visited Father's apartment.

[10] Most concerning is Father's refusal to abstain from using illegal substances and to submit to random drug screens. Father screened positive for amphetamine and methamphetamine once in June of 2018 and multiple times in July of 2018. Following his positive screens in July of 2018, Father refused to complete another drug screen throughout the remainder of this case, a stretch of nearly one and one-half years. At the evidentiary hearing, Father admitted to using drugs recreationally. Even Therapist Kim Cutsinger, who seemed to be the only service provider with whom Father made any progress whatsoever, encouraged Father to comply with court-ordered drug screens, yet he still refused.

[11] Father directs our attention to caselaw from other states in support of his claim that his drug use is not a proper basis for the termination of his parental rights; however, this caselaw is non-binding, and suffice it to say that we find it unpersuasive in any event. Father also directs our attention to *In re T.H.*, 856 N.E.2d 1247 (Ind. Ct. App. 2006), to support his claim that his failure to complete services recommended by DCS is not a proper basis for the termination of his parental rights because the services were not needed. Father's reliance on *In re T.H.*, however, is misplaced. Not only does *In re T.H.* involve a CHINS determination and not a termination of parental rights, the refusal at issue was a father's refusal to complete services that he voluntarily accepted as part of a service referral agreement with DCS and that we concluded were not

actually needed. 856 N.E.2d at 1251. Unlike in *In re T.H.*, Father's services and drugs screens were court-ordered and clearly warranted. A parent who screens positive for illegal substances and is ordered to submit to drug screens, may not refuse to submit to drug screens and expect to maintain his parental rights.

[12] Father's refusal to complete court-ordered services and drugs screens was a blatant disregard for the juvenile court's authority, which it used to ensure that Child was not returned to Father's care unless Child could be properly cared for, and Father's drug use was resolved. A parent who fails to complete services, screens positive for illegal substances, admits to using illegal substances, and refuses to submit to court-ordered drugs screens for nearly one and one-half years faces repercussions in a case where his parental rights are at issue. One such repercussion is the termination of his parental rights. That is what happened in this case, and the juvenile court was justified in its decision.

[13] The judgment of the juvenile court is affirmed.

Baker, Senior Judge, concurs.

Pyle, J., dissents with opinion.

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Termination of the Parent-Child Relationship of C.C. (Minor Child); | Court of Appeals Case No. 20A-JT-289 |
| B.C. (Father), | |
| *Appellant-Defendant,* | |
| v. | |
| The Indiana Department of Child Services, | |
| *Appellee-Plaintiff.* | |

**Pyle, Judge dissenting with opinion.**

[14]   I respectfully dissent from my colleague's opinion because DCS has not met its burden to prove by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in C.C.'s removal or the reasons for placement outside the home will not be remedied.  The reason for C.C.'s removal from Mother's care was *her* drug use.  The reason for C.C.'s removal from Father's care was apparently DCS's belief that Father had abandoned C.C.

[15] DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1231 (Ind. 2013). The clear and convincing evidence standard requires a stricter degree of proof than a mere preponderance of the evidence. *Moore v. Jasper County Dep't of Child Servs.*, 894 N.E.2d 218, 225-26 (Ind. Ct. App. 2008). In ordinary civil actions, a fact in issue is usually sufficiently proved by a preponderance of the evidence. *Id.* at 226. However, "'clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals.'" *Id.* at 226 (quoting *K.J.P. v. State*, 724 N.E.2d 612, 615 (Ind. Ct. App. 2000), *trans. denied*). Such is the case with termination of parental rights proceedings. *Moore*, 894 N.E.2d 226.

[16] The facts of this case are important. As my colleagues ably point out, DCS removed C.C. from Mother's home in October 2017 because of Mother's heroin use and subsequent incarceration. Although DCS placed C.C. with Father, he felt that the DCS case manager "automatically started judging [him]. She automatically acted like [Mother] was better than [Father]. She automatically acted like [Father] was a heroin addict and she just treated [him] in that way." (Tr. Vol. 2 at 108). Father complained to DCS about the case manager and sent DCS copies of the texts that the case manager had sent to him. As a result of the case manager's "inappropriate conduct, [DCS] took her

off the case" at an unknown time and assigned a different case manager to the case. (Tr. Vol. 2 at 108).

[1] Later in October 2017, DCS filed a petition alleging that C.C. was a child in need of services ("CHINS"). Following a December 2017 factfinding hearing, the trial court adjudicated C.C. to be a CHINS. In January 2018, the trial court entered a dispositional order requiring Father to: (1) abstain from the use of illegal substances and obey the law; (2) keep all appointments with DCS, CASA, or service providers and enroll in any program recommended by the case manager or service provider; (3) care for C.C. and meet all of the child's medical and mental health needs; (4) submit to random drug screens; and (5) contact the DCS case manager weekly. C.C. remained in Father's care.

[2] By February 2018, Father, who suffers from "some paranoia as it relates to government entities," had become overwhelmed and felt that DCS was "coming down on [him] like [he] was the one that [had] got[ten] in trouble, it really stressed [him] out[.]" (Tr. Vol. 2 at 52, 93). Father had also been unable to complete his plan to open a tattoo parlor. Father talked to Maternal Great-Grandmother about allowing C.C. to stay at her house for "just a few days" as he had customarily done in the past so that Father could open the tattoo parlor. (Tr. Vol. 2 at 94). Maternal Great-Grandmother agreed to take C.C. When Father dropped C.C. off at her house on February 3, 2018, DCS alleged that

Father had stated that he was "done with placement and court orders." (Tr. Vol. 2 at 38).[3]

[3] When DCS discovered that C.C. was staying with Maternal Great-Grandmother, the agency became concerned that C.C. would have contact with Mother when she was released from jail. On February 5, just two days after Father had dropped C.C. off at Maternal Great-Grandmother's house, DCS filed a petition to remove C.C. from Father's care. In the petition, DCS alleged that it had "secured a placement in Kinship care." (Ex. Vol. at 30). The trial court granted the petition, and DCS placed C.C. in foster care with the Dockerys.

[4] That same month, February 2018, Father hired an attorney to represent him in an action to have C.C. returned to Father's care. However, the attorney did not file any motions or petitions on Father's behalf. In May 2018, Father obtained a new attorney who filed a petition requesting that Father "have placement of [C.C.] again." (Tr. Vol. 2 at 118). Also in May 2018, the trial court appointed CASA Nellie Elsten ("CASA Elsten") to the CHINS case.

[5] The trial court held a hearing on Father's petition in June 2018 and subsequently denied it. In its order denying the petition, the trial court ordered

---

[3] It is important to note that these are not Father's words, as my colleagues seem to suggest in their opinion. Under direct examination by DCS's counsel, Case Manager Marlaina Bertram, who was not present when Father dropped C.C. off with Maternal Great-Grandmother, referred to her case notes in the file and claimed this was the reason why Father dropped off C.C.

Father to: (1) attend supervised visitation with C.C.; (2) attend parenting classes and individual therapy if "he intend[ed] to pursue placement of [C.C.];" and (3) submit to random drug screens. (Ex. Vol. at 16).

[6] Father began supervised visits with C.C., and shortly thereafter, in June 2018, Father submitted a drug screen that tested positive for methamphetamine. Father had two negative drug screens in June and July 2018 and then twice tested positive for methamphetamine again in July 2018.

[7] In August 2018, DCS appointed case manager Marlaina Bertram ("Case Manager Bertram") to C.C.'s case. In October 2018, Father began weekly individual therapy sessions with Kimberly Cutsinger ("Therapist Cutsinger"). Therapist Cutsinger also began supervising Father's weekly visits with C.C.

[8] Father continued his weekly individual therapy sessions with Therapist Cutsinger and his weekly supervised visits with C.C. throughout 2018 and into 2019. Father and Therapist Cutsinger worked on Father's parenting and coping skills. They also worked on ways for Father to deal with his personal struggles and life stressors and discussed substance abuse issues. Therapist Cutsinger further worked with Father on his government paranoia issues. In addition, Therapist Cutsinger encouraged Father to comply with the court-ordered drug screens.

[9] Although Father actively engaged in his individual counseling and visitation with C.C., he faltered somewhat with completing other services. Father did not submit any drug screens after July 2018. Father also did not meet with a case

provider to work on parenting and employment skills as well as time and money management.

[10]     In April 2019, DCS filed a petition to terminate Father's parental relationship with C.C. In September 2019, the trial court held a hearing on the termination petition. Therapist Cutsinger testified that Father had actively participated in weekly individual therapy sessions with her at his home since October 2018, which had almost been a year at the time of the hearing. Sometimes Therapist Cutsinger and Father met twice a week. According to Therapist Cutsinger, Father had always been cooperative, and the therapist had never had any concerns about Father being impaired. Therapist Cutsinger also testified that Father's home was appropriate.

[11]     In addition, Therapist Cutsinger testified that she had supervised weekly visits between Father and C.C. from October 2018 through July 2019. The visits also took place in Father's home. According to Therapist Cutsinger, Father and C.C. had a "really good" relationship. (Tr. Vol. 2 at 82). Therapist Cutsinger had no concerns about how Father interacted with his son. In fact, the therapist had felt that Father had been ready to move to unsupervised visits with C.C. Therapist Cutsinger also had no concerns about Father being able to provide sufficiently for C.C. and testified that termination was not in C.C.'s best interests.

[12]     Father testified that when he had dropped C.C. off at Maternal Great-Grandmother's house on February 3, 2018, Father had intended the visit to last

"just a few days." (Tr. Vol. 2 at 94). According to Father, he had never intended to abandon his son as claimed by DCS. Father also admitted that he "had used recreationally illegal substances[,] but it [was] not something that[] [had] ever controlled his life or [that he] needed treatment for." (Tr. Vol. 2 at 97). Father further testified that he had stable and suitable housing within a two-block radius of four family members and that he was employed as both a construction worker and a tattoo artist. In addition, Father testified that he loved his son and was able to provide for him. According to Father, he wanted to continue therapy with Cutsinger and transition to unsupervised visits with the goal of C.C. returning to his home. Father also wanted Maternal Great-Grandmother and the Dockerys to stay involved in C.C.'s life.

[13] Therapist Shelly Ramsey ("Therapist Ramsey") also testified at the hearing. Therapist Ramsey provided individual therapy to C.C. and supervised Father's visits with C.C. from July 2019 until just a few days before the termination hearing. Therapist Ramsey testified that the visits between Father and C.C. had been going well and that C.C. was "bonded with [Father]." (Tr. Vol. 2 at 32).

[14] Case Manager Bertram testified that there was a reasonable probability that the conditions that had resulted in C.C.'s removal would not be remedied "because [Father] had not completed the [court-ordered] services." (Tr. Vol. 2 at 44). Case Manager Bertram also testified that C.C. had said that he loved Father and that the plan for C.C. was adoption by the Dockerys.

[15] CASA Elsten also testified that there was a reasonable probability that the conditions that had resulted in C.C.'s removal would not be remedied because Father had not cooperated with the court-ordered services. When asked what she had observed of C.C.'s life in the foster home, CASA Elsten stated that "it [was] an immaculate clean home for one thing." (Tr. Vol. 2 at 70). CASA Elsten also testified that the Dockerys "provide[d] for [C.C.] very, very well" and that C.C. was happy in their home. (Tr. Vol. 2 at 70).

[16] At the end of the hearing, the trial court stated as follows: "This is a difficult case for me[.] There are several things that do concern me but sir you made some points. I don't want you to walk out of here thinking that I'm not considering what you've told me because I am." (Tr. Vol. 2 at 139).

[17] In December 2019, the trial court issued a fifteen-page order terminating Father's parental relationship with C.C. The order included a detailed summary of the hearings conducted in the case and the testimony of DCS's witnesses at the termination hearing. Notably, the order includes no mention of Therapist Cutsinger or her testimony at the termination hearing. In its order, the trial court concluded that although Father had "testified that he did not abandon his son and that it was all a misunderstanding, . . . this court finds that claim unbelievable since placement and visitation were litigated multiple times." (App. Vol. 2 at 14). The trial court also concluded that there was "no reasonable probability that the conditions that resulted in [C.C.]'s removal from and continued placement outside the care and custody of the parents will be remedied." (App. Vol. 2 at 14).

[18] Based on my review of the record, at the time of the September 19, 2019 termination hearing, DCS had not proven by clear and convincing evidence that there was a reasonable probability that the conditions that had resulted in C.C.'s removal from Father's care would not be remedied. The evidence reveals that Father was making progress on many fronts. While Father had not completed all of the services offered by DCS, his time with Therapist Cutsinger was yielding evidence of significant changed circumstances. These circumstances, however, seem to have been completely ignored by the trial court.

[19] Concerning drug usage, my colleagues state that a parent who fails to complete services, screens positive for illegal substances, admits to using illegal substances, and refuses to submit to court-ordered drugs screens for nearly one and one-half years faces repercussions in a case where his parental rights are at issue. In most cases, I would agree, but not in this case. C.C. was initially removed from Mother's care because of her heroin addiction. C.C. was subsequently removed from Father's care because DCS assumed that Father had abandoned C.C. Nonetheless, the trial court was rightfully concerned when Father tested positive for drugs and required him to submit to subsequent drug screens. While I agree with my colleagues that Father was obligated to comply with the trial court's order to submit to drug screens, there were other measures available, short of termination of his parental rights, to convince Father to comply. For example, the trial court could have used its contempt powers to compel Father's compliance. *See* INDIANA CODE § 34-47-3-1.

However, DCS never sought, and the trial court did not consider, using this valuable tool. If Father's drug usage was a significant concern, surely such an effort could have been made. *See Moore*, 894 N.E.2d at 226 (explaining that termination of parental rights requires proof by clear and convincing evidence because it has serious social consequences or harsh or far reaching effects on individuals).

[20] I do agree that many of the termination cases heard by this Court involve parents who are tragically ensnared by drug addiction and that the consequences that flow from addiction often produce abusive, violent, and/or unsafe housing conditions for children, justifying the termination of parental rights. *See J.H. v. S.S.*, 93 N.E.3d 1137, 1138 (Ind. Ct. App. 2018) (citing Katherine Q. Seelye, *Children of Heroin Crisis Find Refuge in Grandparent's Arms*, THE NEW YORK TIMES, May 21, 2016). However, trial courts must judge a parent's fitness to care for his or her children at the time of the termination hearing and consider evidence of changed circumstances. (Contrary to that requirement, there was apparently no consideration of the improvement Father had made with Therapist Cutsinger). *In re Termination of Parent Child Relationship of D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), *trans. denied*. In this case, the evidence introduced by DCS, considered by the trial court, and interpreted by my colleagues suggests an effort to punish Father for his refusal to submit to court-ordered drug screens. *See In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999) (explaining that the purpose of terminating parental rights is not to punish the parents but to protect their children), *trans. denied*, *cert.*

*denied.* Based on these facts, where the apparent reason for C.C.'s removal from Father's care was not drug related, I believe DCS has failed to meet its burden, and I respectfully dissent because I do not believe termination is warranted at this time.